IN THE MATTER OF: J. K. ABERNATHY, SS No. 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, EMPLOYEE, ET AL
EASTERN AIR LINES, INC., EMPLOYER, AND EMPLOYMENT SECURI-
TY COMMISSION OF NORTH CAROLINA, RALEIGH, NORTH CAROLINA.

(Filed 10 April 1963.)

1. **Master and Servant § 108—**

The findings of fact of the Employment Security Commission are con-
clusive on appeal when the findings are supported by competent evidence.
G.S. 96-15(i).

2. **Statutes § 5—**

The purposes sought to be accomplished by the legislative branch in
the enactment of a statute will be given due consideration by the courts
in construing the statute.

3. **Master and Servant § 97—**

The Employment Security Act will be construed in the light of the
legislative purposes of providing aid to those out of work through no
fault of their own, and to provide for the accumulation of funds neces-
sary to this end by a tax on employers, supplemented by Federal grant,
and it was not contemplated that such funds should be depleted by, or
used to encourage, work stoppages.

4. **Master and Servant § 106—**

Under the 1961 Amendment to the Employment Security Act, G.S. 96-
14(4), where there is a strike of a group of employees which forces the
employer to shut down his operations in this State, employees in this
State, members of a separate union and different classification who are
not on strike but who are out of work because of the strike, are not en-
titled to unemployment compensation benefits, notwithstanding that the
striking employees are not based in this State when they perform, at
terminals in this State, duties essential to the operation of the em-
ployer's business.

5. **Master and Servant § 97;    Constitutional Law § 11—**

The 1961 Amendment to the Employment Security Act, G.S. 96-14(4),
which imposes a further disqualification on the right of employees to un-
employment benefits upon the stoppage of work because of a strike,
differs only in degree and not in principle to disqualifications theretofore
provided, and the amendment is uniform in its applicaton to the class
specified and is therefore a constitutional exercise of the police power, the
wisdom of the enactment being solely a legislative question.

RODMAN, J., took no part in the consideration or decision of this case.

APPEAL by the Employment Security Commission of North Carolina
from *Riddle, S.J.,* October, 1962 Special "B" Term, MECKLENBURG
Superior Court.

This proceeding was instituted before the Employment Security
Commission of North Carolina, hereafter called the Commission, by

J. K. Abernathy and others, employees of Eastern Air Lines, Inc., (hereafter called Eastern) who filed claims for unemployment insurance benefits during the time they were out of work or furloughed from their jobs as a result of a labor dispute between the flight engineers and Eastern. In due course the Chairman of the Commission ordered the claims referred to R. B. Overton, Special Appeals Deputy, for hearing and disposition. After due notice, the interested parties appeared before Mr. Overton on July 12, 1962. After concluding the hearing on July 18, 1962, the Appeals Commissioner made detailed findings of fact, stated conclusions of law, and ordered that "all those individuals whose names appear on 'Exhibit A' shall be and the same are disqualified from receiving unemployment insurance benefits beginning June 23, 1962, through July 12, 1962, and continuing as long as the labor dispute between Eastern Air Lines, Inc. and the flight engineers remain in active progress and their unemployment is caused thereby."

The parties adversely affected by the finding, conclusion, and order of the Special Appeals Deputy, including the Director, Unemployment Insurance Division, petitioned for and were granted a review by the full Commission. Hearing on review by the Commission began on August 10, 1962. At the conclusion of the hearing the Commission (among other things not deemed essential to the dispute) made these findings:

"1.  Eastern Air Lines, Inc. hereafter referred to as the employer, is a corporation engaged in the business of commercial air transportation, transporting passengers, U. S. mail, and cargo in interstate commerce by means of airplanes, serving twenty-six states in the eastern half of the United States and one hundred and twenty cities, and in addition thereto, serving Mexico City, Puerto Rico, Bermuda and Canada.

"2.  The employer normally employs seventeen thousand nine hundred and six employees throughout its system with between six hundred and fifty and seven hundred being based in North Carolina working at or out of the airports and/or cities served in this State.

"3.  The classification of the employees utilized by the employer consists of various skills and vocations, among which are mechanics and related skills, pilots, stewards, stewardesses, flight engineers, communiction workers, dispatchers, and various clerical workers, and others, including some nonunion personnel.

"4.  The employees of Eastern Air Lines, Inc. are represented through its system by the following unions or associations according to their skills and vocations: (1) International Association of Machinists; (2) Airline Pilots Association; (3) Airline Stewards and Stewardesses Association; (4) Flight Engineers International Association; (5) Communication Workers of America Union; and (6) Airline Dispatchers Association. Such unions or associations have been duly certified under the Federal Statutes as the bargaining agents for their members and all other personnel performing similar or related duties, and such bargaining is on a system-wide basis.

"5.  In its system the employer employs five hundred and seventy-five flight engineers whose services are utilized on four-engine aircraft throughout its system. Some of such four-engine aircraft land and take off with passengers and cargo at all airports in the system located in North Carolina; namely, Charlotte, Raleigh-Durham and Greensboro-High Point, taking on passengers and cargo at each airport as the necessity arises. Jet planes belonging to the employer also land and take off from the airport in Charlotte taking passengers and cargo to and from that airport as the necessity arises. Flight engineers are employed and used on all four-engine and jet aircraft landing and taking off in North Carolina. None of the flight engineers are based in North Carolina although they fly in and out of the various airports on schedules of four-motored piston driven planes and all jet planes serving North Carolina. The flight engineers perform services at each of the company's facilities in North Carolina and elsewhere throughout its entire system. When the four-engine piston driven planes and jet planes land at the North Carolina airports, the flight engineers inspect the planes for safety airworthiness and determine the distribution of gasoline.

"6.  Approximately thirty-five per cent of the planes used by the employer in its system are two-engine aircraft and on all two-engine aircraft the services of flight engineers are not used. Approximately sixty-five per cent of the planes used by the employer in its system consist of four-engine piston planes and jets, all of which utilize the services of flight engineers.

"7.  On June 23, 1962, the five hundred and seventy-five flight engineers went on strike and refused to carry out their work assignments. This strike and refusal to work was in protest of the failure of the employer and the bargaining agent representing the

flight engineers to reach an agreement as to the qualifications of the flight engineers, there being a difference of opinion between such parties as to whether the flight engineers should also be qualified as pilots. Beginning on June 23, 1962, and continuing through the date of the hearing by the Special Appeals Deputy on July 12, 1962, the flight engineers failed and refused to perform their services in bringing planes in and out of the facilities of the employer in North Carolina, and elsewhere.

"8.   In consequence of the strike of the flight engineers, the employer cancelled all flights and furloughed several thousand employees, including its employees in North Carolina, a list of which is hereto attached and marked 'Exhibit A.' Those individuals whose names appear on 'Exhibit A' hereto attached were unemployed beginning June 24, 1962, through July 12, 1962, the date of the hearing before the Special Appeals Deputy, and their unemployment is due to the dispute or controversy in existence between the flight engineers and the employer; that the controversy between the flight engineers and the employer was still in existence as of the date of the hearing before the Special Appeals Deputy on July 12, 1962." * * *

"From the findings of fact . . . it is concluded that a labor dispute was in active progress between Eastern Air Lines, Inc., and the flight engineers on June 23, 1962, at the time of the strike or walkout of the flight engineers, and that such labor dispute was still in active progress as of July 12, 1962." The Commission, by Decision No. 3301, denied the claims upon the ground that G.S. 96-14(4) disqualified the laid-off employees for insurance benefits. Upon appeal and after hearing, the Superior Court entered the following order:

"AND THE COURT being of the opinion that the Employment Security Commission is in error in finding and concluding that the claimants are disqualified from receiving Employment Security benefits by reason of the provisions of G.S. 96-14(4) upon facts and circumstances revealed by the evidence in the record, and that its decision is therefore in error and should be set aside; AND THE COURT being of the further opinion that if, upon the record before the Commission, the provisions of G.S. 96-14(4) should be construed as imposing a disqualification upon the appealing claimants who are otherwise eligible for employment benefits, then the provisions of G.S. 96-14(4), as so applied under the facts and circumstances of this case established by the record herein, constitute an unlawful discrimination against these claim-

ants in violation of rights guaranteed to them by the Statutes and Constitution of the United States and by the Constitution of the State of North Carolina.

"NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED, that Decision No. 3301 rendered by the Employment Security Commission of North Carolina on August 31, 1962, be and the same is hereby reversed and set aside."

The Employment Security Commission of North Carolina appealed.

*W. D. Holoman, R. B. Billings, D. G. Ball, for the Employment Security Commission of North Carolina, appellant.*

*Gambrell, Harlan, Russell, Moye & Richardson, by E. Smythe Gambrell, William G. Bell, Jr., Harold N. Hill, Jr., Sidney F. Wheeler, for Eastern Air Lines, Inc., appellee.*

*Blakeney, Alexander & Machen, by Bailey Patrick, Jr., for North Carolina Employees of Eastern Air Lines Inc., Except the 123 captains and Air Line Pilots based in North Carolina appellees.*

*Warren C. Stack, by James L. Cole, for Charlotte Council, Air Line Pilots Association, Eastern Air Lines, Inc., appellees.*

*Joyner & Howison, by William T. Joyner, for Harriet Cotton Mills and Henderson Cotton Mills, amicus curiae.*

HIGGINS, J.   Here for review is the Superior Court judgment that the Employment Security Commission committed error (1) "In finding and concluding that claimants are disqualified from receiving Employment Security benefits by reason of the provisions of G.S. 96-14(4) upon the facts and circumstances revealed by the evidence in the record, . . ." and (2) If the 1961 amendment should be construed as a disqualification, then it constitutes an unlawful discrimination in violation of the State and Federal Constitutions. From this judgment the Commission appealed. The right to appeal is given by G.S. 96-15.

In their appeal to the Superior Court from the Commission, the claimants, by exceptions, challenged the sufficiency of the evidence to support the Commission's findings of fact. The trial court did not pass on these exceptions. It seems from the wording of the judgment the court did not attempt to set aside any of the findings. However, to eliminate any uncertainty in this respect, we have reviewed all the evidence and conclude that it furnishes support for the Commission's findings of fact. Findings, supported by competent evidence, are conclusive on appeal. *Employment Security Comm. v. Freight Lines,* 248 N.C. 496, 103 S.E. 2d 829; *In Re Stutts,* 245 N.C. 405, 95 S.E. 2d 919;

In re Abernathy.

*Employment Security Commission v. Simpson,* 238 N.C. 296, 77 S.E. 2d 718; G.S. 96-15(i). The pivotal question, therefore, is whether the claimants are disqualified by the 1961 amendment to G.S. 96-14.

In the judicial process of construing legislation the courts take a long look at the purposes to be accomplished. The Congress, using the English Act of 1911 as a pattern, passed the Federal Social Security Act on August 14, 1935. One of its major purposes was to give aid, to be administered through State agencies, to those out of work through no fault of their own. To be eligible for Federal contributions, a State agency was required to levy an unemployment compensation tax on employers to supplement the Federal contribution. In its extra session in 1936 the North Carolina General Assembly enacted its Unemployment Compensation Law to take advantage of the Federal grant. One of its major purposes was to provide a fund by systematic accumulations during periods of employment to be retained and used for the benefit of persons furloughed from their jobs through no fault of their own.

Both the State and Federal Acts were passed at a time when the country appeared to be in the initial stages of recovery from a disastrous depression. The lessons learned in the early thirties were both fresh and poignant. The intent was to accumulate, by Federal grant and by an employer's tax, an insurance fund which in a time of need would tide over workers temporarily laid off because work was not available. Employers in all probability did not contemplate their tax money would be used to encourage any work stoppage resulting from a labor dispute. In discussing this background, the Nebraska Law Review, Vol. 37, No. 4, of June, 1958, contained the following:

"(1).  (I)t was not considered wise to permit the fund to be used to finance or subsidize workers engaged in trade disputes, because it was feared that if benefits were available to all workers unemployed as a result of a trade dispute, they would be encouraged to suspend work in furtherance of their position in the dispute, thereby imposing an unfair burden upon the employer, and working injury upon the national economy and upon the public at large; (2) because there had been no previous experience, it was feared that payment of benefits when unemployment was due to a labor dispute might cause a severe drain upon the funds available, thereby defeating the primary purpose for which the fund was created—the payment of benefits when unemployment was due to 'fluctuations in trade.' "

It is doubtful whether in 1935-36 legislators — Federal or State — had in contemplation a time when a few specialists out on strike could force a shutdown of a flourishing business employing nearly 18,000 persons in 26 states, the District of Columbia, Canada, Mexico, and Puerto Rico. Neither was it contemplated that the insurance fund could be depleted by workers who were not actually participating in the strike but who were out of work because of it. The depletion of the insurance fund required further employer taxes.

As the years passed the original objects lost some of their clear outlines. Rules and regulations were relaxed permitting depletion of the fund for purposes not in contemplation when provision was made for it. However, in North Carolina the amendment of 1961 reversed the trend. Prior to July 1, 1961, G.S. 96-14 provided:

> "An individual shall be disqualified for benefits . . . (4) For any week with respect to which the Commission finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed, provided that this subsection shall not apply if it is shown to the satisfaction of the Commission that—(a) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and
>
> (b) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute: Provided, for the purpose of this subdivision (4), that if in any case separate branches of work which are commonly conducted as separate business in separate premises are conducted in separate departments of the same premises, each such department shall be deemed to be a separate factory, establishment, or other premises."

Effective July 1, 1961, the General Assembly, by Chapter 454, Session Laws of 1961, struck out all of Section 4 above quoted and substituted the following:

> "(4)  For any week with respect to which the Commission finds that his total or partial unemployment is caused by a labor dispute in active progress on or after July 1, 1961, at the factory, establishment, or other premises at which he is or was last employed or caused after such date by a labor dispute at another place,

either within or without this State, which is owned or operated by the same employing unit which owns or operates the factory, establishment, or other premises at which he is or was last employed and which supplies materials or services necessary to the continued and usual operation of the premises at which he is or was last employed. Provided, that an individual disqualified under the provisions of this subdivision shall continue to be disqualified thereunder after the labor dispute has ceased to be in active progress for such period of time as is reasonably necessary and required to physically resume operations in the method of operating in use at the plant, factory, or establishment of the employing unit."

The effect of the amendment was to eliminate from Section 4 the means therein provided by which an employee might escape disqualification. Likewise, the amendment removed the provision that separate branches of work commonly conducted in separate premises or in separate departments of the same premises shall be deemed to be separate factories, establishments, or other premises. Instead the amendment extended the disqualification if the unemployment is caused by labor dispute in progress at the factory at which the worker was employed or at another place, either within or without this State, if owned or operated by the same employing unit and which supplies materials or services necessary to continue the operation where he was employed.

In this case planes carrying practically two-thirds of Eastern Air Line's transportation business were grounded because flight engineers refused to operate or to service the planes. Only two-motor craft could operate without the flight engineers. These small planes were engaged in feeder operations on short flights. The heart of Eastern's business was the four-motor and jet planes. As a result of the labor dispute between Eastern and its flight engineers, Eastern was forced to shut down its operations and to close its terminals in North Carolina where claimants had been at work. So far as the results are concerned, it was immaterial where the flight engineers lived, or where their flights originated. When they left the planes, transportation stopped. Eastern's employees at the terminals in North Carolina were furloughed because Eastern was forced out of business by the strike.

Without force is the argument that flight engineers were not based in North Carolina and hence the terminals in this State constituted other plants, factories, establishments, and premises of the employing unit. It must be remembered that new Section 4, in effect at the time

the work stopped, extends the disqualification to workers at a factory, establishment, or other premise which supplies necessary materials or services to the plant where the claimants were last employed. The striking flight engineers refused to help man the planes to or from the terminals in North Carolina. This failure to perform this service caused the shutdown at the terminals where claimants were employed.

The many cases cited by the Air Line Pilots Association are not in point. Their brief states: "Since no statute has been found in any jurisdiction written in the discriminatory language of G.S. 96-14(4), as amended, all cases reviewed reveal situations arising under Unemployment Security Acts which are similar to the North Carolina Unemployment Security Act prior to 1961." The Commission was bound by the disqualifying terms of the 1961 amendment. Its duty was to protect the integrity of the insurance fund and to be neutral between the management and the workers.

The disqualification resulted from the labor dispute between the flight engineers and Eastern. All flight engineers in the system were out on strike. Their duties were so integrated into Eastern's entire operation that the big planes were grounded because of their refusal to work. *Cameron v. DeBoard,* 230 Or. 411, 370 P. 2d 709; *Depaoli v. Ernst,* 73 Nev. 79, 309 P. 2d 363; *Adamski v. State, Bureau of Unemployment Comp.,* 108 Ohio App. 198, 161 N.E. 2d 907; *Spielmann v. Industrial Commission,* 236 Wis. 240, 295 N.W. 1; *Ford Motor Co. v. Abercrombie,* 207 Ga. 464, 62 S.E. 209; *Park v. Appeal Board of Michigan Employ. Sec. Com'n.,* 255 Mich. 103, 394 N.W. 2d 407; *Magner v. Kinney,* 141 Neb. 122, 2 N.W. 2d 689.

The cases here discussed, and many more therein cited, would seem sufficient to convince all but the highly skeptical that in passing the 1961 amendment the North Carolina General Assembly acted within its constitutional powers. "When the subject lies within the police power of the State, debatable questions as to reasonableness are not for the courts but for the legislature, which is entitled to form its own judgment, and its action within its range of discretion cannot be set aside because compliance is burdensome." *Sproles v. Binford,* 286 U.S. 374, 52 S. Ct. 581, 76 L. ed. 1167; *In re Stevenson,* 237 N.C. 528, 75 S.E. 2d 520; *Employment Security Com. v. Jarrell,* 231 N.C. 381, 57 S.E. 2d 403; *In re Steelman,* 219 N.C. 306, 13 S.E. 2d 544. "Legislative bodies may distinguish, select, and classify objects of legislation. . . . They may prescribe different regulations for different classes. . . . The one requirement is that the ordinance must affect all persons similarly situated or engaged in the same business without discrimination." *State v. Trantham,* 230 N.C. 641, 55 S.E. 2d 198; see also, *Bickett v.*

*Tax Commission,* 177 N.C. 433, 99 S.E. 415; *Magoin v. Bank,* 170 U.S. 283, 18 S. CT. 594, 42 L. ed. 1037; *City of Springfield v. Smith,* 322 Mo. 1129, 19 S.W. 2d 1; *Unemployment Compensation Com. v. Willis,* 219 N.C. 709, 15 S.E. 2d 4; *Steward Machine Co. v. Davis,* 301 U.S. 548, 57 S. Ct. 883, 81 L. ed. 1279. The unemployment insurance acts of the states contain certain worker disqualifications, among them, (1) discharge for misconduct, (2) refusal to accept other suitable employment, (3) participation in a strike. The power of the legislature to provide these disqualifications is not challenged. The further disqualification contained in the 1961 amendment involves a question of degree and not of principle.

For the reasons here stated, we hold the judgment of the Superior Court of Mecklenburg County was erroneous and must be

Reversed.

RODMAN, J., took no part in the consideration or decision of this case.