IN THE MATTER OF: MICHAEL W. SARVIS, WILLIAM E. FURR, WADE H. RABON, RALPH A. McCRAY, CLAY I. CALL, MIKE H. KIVETT, BOBBY W. RABON, JAMES K. BURCHETT, HARRISON E. EMMERT, ARNOLD B. SMITH, ROBERT J. CAMP, CHARLES W. CLARK, JR., H. T. VARNUM, HOWARD D. PEEL, MIRLIN H. PEEL, EUGENE C. McCRAY, EMPLOYEES; HIGH POINT SPRINKLER COMPANY, EMPLOYER; AND EMPLOYMENT SECURITY COMMISSION OF NORTH CAROLINA

No. 97

(Filed 5 February 1979)     ·

1. **Master and Servant § 109— unemployment compensation—striking employees replaced—strike ended—disqualification for unemployment benefits lifted**

An employer's inability to reinstate previously replaced employees after they abandoned their strike and unconditionally offered to return to work changed the cause of unemployment from a labor dispute in active progress to unavailability of work and thus lifted the disqualification for unemployment compensation.

2. **Master and Servant § 109— unemployment compensation—striking employees replaced—strike ended—labor dispute not extended by proceedings before NLRB**

 The pendency of an unfair labor practices charge and an election petition before the National Labor Relations Board did not keep employees' labor dispute in "active progress" after they terminated their strike so as to disqualify them for unemployment compensation, since an unfair labor practice charge filed by employees and an election petition filed by a union, though labor disputes, cannot legally cause unemployment, and the disqualification in G.S. 96-14(5) applies solely to those active labor disputes which cause unemployment.

3. **Master and Servant § 109— labor dispute—definition unnecessary in unemployment compensation case**

 Since a comprehensive definition of "labor dispute" is not necessary for resolution of this case, the Supreme Court neither adopts nor rejects the definition found in the Norris-LaGuardia Act, 29 U.S.C. § 113 (1970).

4. **Master and Servant § 109; Constitutional Law § 1— striking employees replaced—withholding of unemployment benefits not required by Supremacy Clause**

 The Supremacy Clause, U.S. Const. Art. VI, cl. 2, did not require that unemployment benefits be withheld from employees who were replaced by employer before they abandoned their strike and offered unconditionally to return to work, since payment of unemployment benefits by N.C. under the circumstances of this case would not impermissibly infringe upon the arena of economic warfare delineated by Congress in which the balance of power between labor and management is determined solely by the economic strength of the parties, as benefits would be awarded after both parties had fully exerted their economic strength against each other and determined that the balance of power favored employer.

 Justice BROCK did not participate in the consideration or decision of this case.

ON petition for discretionary review of decision of the Court of Appeals, 36 N.C. App. 476, 245 S.E. 2d 176 (1978), remanding the case to the Employment Security Commission for further findings of fact and entry of an order consistent with its decision.

This is a proceeding before the Employment Security Commission (hereafter Commission) for the *sole* purpose of determining whether certain employees (hereafter Employees) of High Point Sprinkler Company (hereafter Employer) were disqualified to receive unemployment compensation benefits by the "labor dispute in active progress" test contained in G.S. 96-14(5). It should be noted that resolution of this issue in favor of Em-

ployees does not automatically entitle them to unemployment benefits. Employees must demonstrate in further proceedings before the Commission that they have satisfied the remaining statutory prerequisites and are therefore entitled to unemployment benefits. Those proceedings are not part of this appeal.

The record discloses that Employees participated in a strike which began on 27 February 1976. The strike was precipitated by a dispute over economic benefits and Employer's decision to transfer one of the Employees. On 6 March 1976 Employees abandoned their strike by notifying Employer of their unconditional offer to return to work immediately. At that point two of the strikers returned to work. The remaining strikers were not reinstated by Employer because it had hired replacements for them and no longer had work available.

The labor dispute which led to the strike of 27 February 1976 also gave rise to certain proceedings before the National Labor Relations Board (hereafter NLRB). The proceedings before the NLRB were initiated on 2 March and 9 March 1976 and remained pending long after the termination of the strike on 6 March 1976. The proceedings before the NLRB were resolved by 22 October 1976.

On 9 April 1976 a Special Appeals Deputy with the Commission found facts and concluded that pursuant to G.S. 96-14(5) Employees were disqualified for benefits from 27 February 1976 to 6 March 1976 and that said disqualification was lifted effective 7 March 1976. The full Commission affirmed the Special Appeals Deputy and Employer appealed to superior court.

The superior court held that the facts found by the Special Appeals Deputy and adopted by the Commission were supported by competent evidence but reversed the Commission's conclusions of law, holding that Employees' disqualification for benefits continued during pendency of the election petition and the unfair labor practices charge before the NLRB. Employees and Employer both appealed to the Court of Appeals.

On 6 June 1978 the Court of Appeals held, in pertinent part, that one of the proceedings pending before the NLRB on 6 March 1976 — the election petition filed 2 March 1976 for certification of a union as bargaining agent at Employer's premises — if related to

the dispute which led to the strike of 27 February 1976, would keep the labor dispute in active progress beyond termination of the strike and thus extend the disqualification for benefits until 22 October 1976—the date said petition was resolved. The Court of Appeals remanded the case to the Commission for findings of fact as to whether the election petition was related to the labor dispute which arose 27 February 1976 and for entry of an order consistent with the court's decision.

Both Employer and Employees appealed to the Supreme Court on constitutional grounds and, in the alternative, petitioned for discretionary review of the decision of the Court of Appeals.

Other facts pertinent to decision are set out in the opinion.

*Smith, Patterson, Follin, Curtis, James & Harkavy, by Henry N. Patterson, Jr.; Michael K. Curtis and Jonathan R. Harkavy, attorneys for Employee appellants.*

*Turner, Enochs, Foster & Burnley, P.A., by C. Allen Foster and Eric P. Handler, attorneys for Employer appellant.*

*Howard G. Doyle; Garland D. Crenshaw; Thomas S. Whitaker; Gail C. Arneke and V. Henry Gransee, Jr., by Thomas S. Whitaker, attorneys for Commission appellee.*

HUSKINS, Justice.

Our unemployment compensation statute, in pertinent part, disqualifies an individual for benefits "[f]or any week with respect to which the Commission finds that his total or partial unemployment is caused by a labor dispute in active progress . . . at the factory, establishment or other premises at which he is or was last employed. . . ." G.S. 96-14(5).

In order for the labor dispute disqualification to apply, the Commission must find the unemployment in question was "caused by a labor dispute in active progress." The central issue in this appeal is whether Employees' unemployment after the termination of their strike on 6 March 1976 was caused by a labor dispute in active progress.

Employees went on strike from 27 February to 6 March 1976. All parties to this appeal are agreed that this strike—a labor dispute in active progress—was the original cause of unemploy-

ment and that Employees were disqualified to receive unemployment benefits for the duration of the strike—27 February to 6 March 1976.

On 3 March 1976 Employer hired permanent replacements for the striking Employees. On 6 March 1976 Employees abandoned their strike by notifying Employer of their unconditional offer to return to work immediately. Employer, however, could reinstate only two of the Employees since it had previously hired permanent replacements to fill the jobs left vacant by the strikers.

[1] Employees contend that after 6 March 1976 their unemployment was no longer caused by a labor dispute in active progress but, rather, was caused by Employer's inability to provide jobs for them. Employer contends there was no change in the cause of unemployment after 6 March 1976. Thus, the first question presented for review is whether Employer's inability to reinstate previously replaced Employees after they abandoned their strike and unconditionally offered to return to work changed the cause of unemployment and lifted the disqualification for benefits.

The question is a matter of first impression in our jurisdiction. *But cf., Employment Security Com. v. Jarrell*, 231 N.C. 381, 57 S.E. 2d 403 (1950) (recognizing under earlier version of G.S. 96-14(5) that abandonment of dispute by employees effected change in cause of unemployment so as to lift disqualification). We have examined cases from other jurisdictions which have confronted this issue under substantially similar statutory language. These cases hold that an abandonment of the strike and unconditional offer to return to work by employees who were replaced during the pendency of the strike lifts the labor dispute disqualification. Under such circumstances, reason the cases, the cause of unemployment is no longer a labor dispute in active progress; rather, it is the lack of available work. *Bailey v. Tennessee Dept. of Employment Security*, 212 Tenn. 422, 370 S.W. 2d 492 (1963); *Special Products Co. of Tennessee v. Jennings*, 209 Tenn. 316, 353 S.W. 2d 561 (1962); *Colee v. Employment Division*, 25 Or. App. 39, 548 P. 2d 167 (1976); *Skookum Co., Inc. v. Employment Division*, 24 Or. App. 271, 545 P. 2d 914 (1976); *cf. Ruberoid Co. v. California Unemployment Ins. App. Bd.* 59 Cal. 2d 73, 27 Cal. Rptr. 878, 378 P. 2d 102 (1963); *Baugh v. United Tel. Co.*, 54

Ohio St. 2d 419, 377 N.E. 2d 766 (1978) (mere replacement of strikers by employer, without abandonment of dispute by strikers, sufficient to lift labor dispute disqualification). *See generally, Johnson v. Wilson & Co.*, 266 Minn. 500, 124 N.W. 2d 496 (1963); *Rice Lake Creamery Co. v. Industrial Comm.*, 15 Wis. 2d 177, 112 N.W. 2d 202 (1962); *T. R. Miller Mill Co. v. Johns*, 261 Ala. 615, 75 So. 2d 675 (1954).

We think the results and reasoning in the Tennessee and Oregon cases cited above are in accord with the concerns which prompted the General Assembly to incorporate a labor dispute disqualification into our law. The major purpose of our Employment Security law, G.S. 96-1 *et seq.*, is "to provide a fund by systematic accumulation during periods of employment to be retained and used for the benefit of persons furloughed from their jobs through no fault of their own." *In re Abernathy*, 259 N.C. 190, 130 S.E. 2d 292, *appeal dismissed*, 375 U.S. 161 (1963). See G.S. 96-2. In light of this purpose " 'it was not considered wise to permit the fund to be used to finance or subsidize workers engaged in trade disputes because it was feared that if benefits were available to all workers unemployed as a result of a trade dispute, they would be encouraged to suspend work in furtherance of their position in the dispute, thereby imposing an unfair burden upon the employer and working injury upon the national economy and the public at large.' " *In re Abernathy*, supra, *quoting* Haggart, *Unemployment Compensation During Labor Disputes*, 37 Neb. L. Rev. 668, 686 (1958). Additionally, " 'it was feared that payment of benefits when unemployment was due to a labor dispute might cause a severe drain upon the funds available, thereby defeating the primary purpose for which the fund was created—the payment of benefits when unemployment was due to fluctuations in trade.' " *Id.*

We conclude that the concerns which prompted enactment of the labor dispute disqualification—the reluctance to force employers to finance a strike against themselves and the fear of disastrous depletion of the unemployment fund—no longer exists when striking employees renounce their strike and unconditionally offer to return to work. At such juncture "the public policy against interference in a strike or labor dispute [dissolves] and the policy of alleviating hardships resulting from unemployment [becomes] applicable." *Johnson v. Wilson & Co., supra.* Conse-

quently, a court applying G.S. 96-14(5) does no violence to the legislative intent when it recognizes that an employer's inability to reinstate previously replaced employees after they abandon their strike and unconditionally offer to return to work changes the cause of unemployment so as to lift the disqualification of employees for benefits.

We thus hold in this case that the labor dispute disqualification was no longer applicable to Employees after 6 March 1976—the date they renounced their strike and unconditionally offered to return to work. After that date unemployment was no longer caused by a labor dispute in active progress. *Accord, Bailey v. Tennessee Dept. of Employment Security, supra; Special Products Co. of Tennessee v. Jennings, supra; Colee v. Employment Division, supra; Skookum Co., Inc. v. Division, supra;* cf. *Employment Security Com. v. Jarrell, supra.*

[2] The labor dispute which led to the strike of 27 February 1976 also gave rise to certain proceedings before the NLRB. On 2 March 1976 the Upholsterer's International Union of North America filed an election petition with the NLRB for certification as bargaining agent at the premises of Employer. On 9 March 1976 Employees filed an unfair labor practice charge against Employer with the NLRB, alleging Employer had unlawfully denied reinstatement to Employees following the strike. The unfair labor practice charges were settled on 25 June 1976, and the certification petition was resolved on 22 October 1976.

Employer contends that, notwithstanding Employees' offer to return to work on 6 March 1976, the labor dispute remained in active progress as long as proceedings were pending before the NLRB. According to Employer, Employees should be disqualified to receive benefits until 22 October 1976, the date the certification proceeding was resolved. Employees contend that the disqualification should be lifted as of 6 March 1976 since the labor dispute which *caused* their unemployment—the strike—was no longer in active progress after that date. The second question presented for review, then, is whether the pendency of the unfair labor practices charge and the election petition before the NLRB kept the labor dispute in "active progress" after 6 March 1976.

We think the plain meaning of the statutory language compels a conclusion that the matters pending before the NLRB did

not keep the labor dispute disqualification in effect after 6 March 1976. For the disqualification provisions of G.S. 96-14(5) to apply, the Employment Security Commission must find that "total or partial unemployment *is caused* by a labor dispute in active progress." (Emphasis added.) Thus, the only type of active labor dispute which keeps the idle worker disqualified for benefits is one which causes unemployment.

We recognize that an unfair labor practice charge filed with the NLRB by an employee, or an election petition filed by a union with the NLRB, are forms of labor disputes; however, these types of disputes between employer and employee cannot legally cause unemployment. *See* R. Gorman, Labor Law, Chapter 7, §§ 3, 4 (1976). The National Labor Relations Act makes it illegal for an employer to discharge or otherwise discriminate against an employee for filing an unfair labor practice charge or for supporting an election petition filed by a union. *NLRB v. Scrivener*, 405 U.S. 117, 31 L.Ed. 2d 79, 92 S.Ct. 798 (1972); *NLRB v. Lester Brothers, Inc.*, 301 F. 2d 62 (4th Cir. 1962).

This being true, it follows that subsequent to 6 March 1976 the cause of Employees' unemployment was employer's inability to reinstate them and not the proceedings pending before the NLRB. Accordingly, the labor dispute disqualification ceased after 6 March 1976. The decision of the Court of Appeals is reversed insofar as it holds that the election petition of 2 March 1976 could or might keep the labor dispute in active progress for purposes of applying the labor dispute disqualification.

Additionally, we note that the interpretation of G.S. 96-14(5) urged by Employer would likely be contrary to the Supremacy Clause, U.S. Const., art. VI, cl. 2, under the holding in *Nash v. Florida Industrial Commission*, 389 U.S. 235, 19 L.Ed. 2d 438, 88 S.Ct. 362 (1967). In *Nash* the United States Supreme Court held it was improper for a state to deny a claimant unemployment benefits on the ground that her filing of an unfair labor charge against her former employer indicated that her unemployment was due to a labor dispute in active progress. The Court reasoned that under the Supremacy Clause a state cannot "defeat or handicap a valid national objective by threatening to withdraw state benefits from persons simply because they cooperate with the [Federal] Government's constitutional plan." *Id.* Similarly, the in-

terpretation urged by Employer in this case would result in a denial of benefits to claimants who file an unfair labor practice charge or support an election petition on grounds that arguably violate the Supremacy Clause. Such a result is constitutionally suspect under the holding in *Nash*. It is well settled that a statute will not be construed so as to raise a serious question as to its constitutionality if a different construction which will avoid the question of constitutionality is reasonable. *Milk Commission v. Food Stores*, 270 N.C. 323, 154 S.E. 2d 548 (1967). The interpretation we give G.S. 96-14(5) avoids the constitutional difficulties inherent in the views urged by Employer.

[3] The Employment Security Commission and the Court of Appeals adopted the definition of "labor dispute" found in the Norris-LaGuardia Act, 29 U.S.C. § 113 (1970), as the proper definition of that term as it is used in G.S. 96-14(5). In our view a comprehensive definition of "labor dispute" is not necessary to resolution of this case and, for that reason, we neither adopt nor reject the Norris-LaGuardia definition. The term "labor dispute" embraces a large spectrum of disputes, some of which cause unemployment and some of which do not. Here, we are concerned only with (1) a strike, (2) an election petition filed with the NLRB for certification of a union as bargaining agent for Employer's premises and (3) an unfair labor practice charge against Employer filed by Employees. Since we hold that the strike alone caused the unemployment of Employees, we leave the comprehensive definition of "labor dispute" to another day. In this case we determine only that the disqualification in G.S. 96-14(5) applies solely to those active labor disputes which *cause unemployment*.

[4] Finally, Employer contends the Supremacy Clause, U.S. Const., art. VI, cl. 2, requires that unemployment benefits be withheld in this case. Employer argues that payment of unemployment benefits by the State to workers who have lost their jobs and are no longer striking alters the economic balance in a labor dispute in Employees' favor and therefore conflicts with the federal labor policy favoring the free play of economic forces in a labor dispute.

At the outset we recognize Congress intended that conduct by labor and management which is neither protected nor prohibited by the National Labor Relations Act be left unregulated

by the states to the extent such conduct does not interfere with the interest of the State in public safety and order. *Compare Machinists v. Wisconsin Emp. Rel. Comm'n*, 427 U.S. 132, 49 L.Ed. 2d 396, 96 S.Ct. 2548 (1976), *with Youngdahl v. Rainfair, Inc.*, 355 U.S. 131, 2 L.Ed. 2d 151, 78 S.Ct. 206 (1957). Such conduct is left " 'to be controlled by the free play of economic forces.' " *Machinists v. Wisconsin Emp. Rel. Comm'n*, supra, *quoting NLRB v. Nash-Finch Co.*, 404 U.S. 138, 30 L.Ed. 2d 328, 92 S.Ct. 373 (1971). Thus, in formulating federal labor policy Congress purposefully refrained from regulating certain activities of labor and management, preferring instead that both be free to utilize economic pressure devices in the settlement of their disputes. By its silence as to such conduct Congress intentionally struck a balance between labor and management, allowing them to use against each other the economic weapons at their disposal. *See* Cox, *Labor Law Preemption Revisited*, 85 Harv. L. Rev. 1337, 1352 (1972). *Accord, Machinists v. Wisconsin Emp. Rel. Comm'n*, supra. We note however that the "federal law governing labor relations does not withdraw 'from the States . . . power to regulate where the activity regulated [is] a merely peripheral concern of the Labor Management Relations Act.' " *Machinists v. Wisconsin Emp. Rel. Comm'n, supra, quoting San Diego Unions v. Garmon*, 359 U.S. 236, 3 L.Ed. 2d 775, 79 S.Ct. 773 (1959).

Would payment of unemployment benefits by North Carolina under the circumstances of this case impermissibly infringe upon the arena of economic warfare delineated by Congress in which the balance of power between labor and management is determined solely by the economic strength of the parties? We think not because benefits would be awarded after both parties had fully exerted their economic strength against each other and determined that the balance of power favored Employer. An award of unemployment benefits under such circumstances would only be of peripheral concern to federal labor policy.

Analysis of this labor dispute indicates that both sides made full, unflinching use of the economic weapons at their disposal. Employees struck and Employer retaliated. Ultimately Employer proved to have the stronger hand. Employees abandoned their strike and unconditionally offered to return to work but lost their jobs to the replacements already hired by Employer. Thus, the balance of power between labor and management was determined

solely by the economic strength of the parties. When Employees abandoned their strike and offered to return to work, the federal and state policies of noninterference in a labor dispute were no longer pertinent and the state policy of alleviating the hardships of unemployment again became applicable. Accordingly, benefits may be awarded in this case without raising concerns that the economic balance between labor and management struck by Congress is being altered. *See Machinists v. Wisconsin Emp. Rel. Comm'n, supra* (Powell, J., concurring).

In sum, the preemption created by federal labor legislation does not preclude the award of unemployment benefits in this case. The fact that such an award "may have an incidental effect on relative bargaining strength," *id.* (Powell, J., concurring), does not constitute sufficient interference with national labor policy to warrant application of the preemption doctrine. *See* Cox, *Labor Law Preemption Revisited*, 85 Harv. L. Rev. 1337, 1355-56 (1972); *cf. New York Tel. Co. v. New York Dept. of Labor*, 566 F. 2d 388 (2d Cir. 1977), *cert. granted*, 435 U.S. 941 (1978) (payment of unemployment benefits to striking employees does not violate Supremacy Clause).

In light of our disposition of this case it is unnecessary to remand to the Employment Security Commission for findings of fact as to whether the 2 March 1976 election petition filed by the Upholsterer's International Union of North America related to the labor dispute which arose 27 February 1976. The decision of the Employment Security Commission disqualifying Employees for benefits from 27 February 1976 to 6 March 1976 and lifting said disqualification effective 7 March 1976 was correct and must be reinstated.

The decision of the Court of Appeals, insofar as it conflicts with this opinion, is reversed. The case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

Justice BROCK did not participate in the consideration or decision of this case.