JOHN MORRELL & COMPANY,
Employer and Appellant,

v.

SOUTH DAKOTA DEPARTMENT OF
LABOR, UNEMPLOYMENT INSUR-
ANCE DIVISION, and Claimants Ray
Handle, James M. Harris, Lawrence A.
Hewer, Darwin Jaqua, Jim Knopf, Phil-
ip Langner, Jerome Nelson, Gerald
Skilliman, et al., Appellees.

No. 16581.

Supreme Court of South Dakota.

Argued Oct. 18, 1989.

Decided July 25, 1990.

Rehearing Denied Sept. 30, 1990.

Jeremiah D. Murphy, James E. McMahon, David L. Vickers of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for employer and appellant.

Harry H. Smith of Smith & Smith, Sioux City, Drew C. Johnson, Aberdeen, for appellees.

TUCKER, Circuit Judge.

This is an appeal from a circuit court order affirming the decision of the Department of Labor Unemployment Insurance Division (Department). Department awarded unemployment compensation benefits to claimants, employees of John Morrell & Company (Morrell). Department ruled that claimants were eligible for benefits after the strike ended and they unconditionally offered to return to work, but were unable to return since their positions had been filled by replacement workers. Morrell appeals to this court. We affirm.

## FACTS

Claimants are members of Local 304A United Food and Commercial Workers Union (Local 304A) who worked full-time at the Morrell Meat Packing Plant in Sioux Falls, South Dakota, prior to May 1, 1987. On May 1, 1987, claimants honored a picket line set up at the Sioux Falls plant by union workers from a Sioux City Morrell plant.

From May 1 to November 4, 1987, when the picket line was removed, Morrell hired a large number of permanent replacement workers in order to continue operations at its Sioux Falls plant. On November 4, 1987, the Sioux City union removed their picket line at the Sioux Falls plant, and the Sioux Falls Local 304A unconditionally offered to return to work on behalf of all of its members. At the time Morrell received the offer to return to work, the Sioux Falls plant was almost totally staffed by replacement workers. As a result, Morrell did not begin recalling union workers before January 4, 1988, and very few of the workers in claimants' class were placed back into the work force.

Morrell admits that it did not discharge, reprimand, or take any disciplinary action against the members of Local 304A for honoring the Sioux City picket line. Neither Morrell nor claimants believed that Morrell had fired the workers who honored the picket line nor had claimants quit their employment. Claimants were treated in all respects as employees who were not actively working.

Following Local 304A's unconditional offer to return to work, claimants began filing new or additional claims for unemployment benefits. Morrell challenged these claims. They were consolidated into a single case with twenty claimants, selected at random by the administrative law judge, serving as representative for all claimants.

After a hearing, the administrative law judge concluded that claimants were not entitled to benefits while they refused to cross the picket line. However, on November 4, 1987, when the picket line was removed and Local 304A made an unconditional offer to return to work, claimants became entitled to unemployment benefits. The circuit court affirmed this ruling.

On appeal, Morrell raises three issues: ISSUE ONE: WERE CLAIMANTS UNEMPLOYED DUE TO A LABOR DISPUTE MAKING THEM INELIGIBLE TO RECEIVE UNEMPLOYMENT BENEFITS AFTER THE PICKET LINE WAS REMOVED AND CLAIMANTS

UNCONDITIONALLY OFFERED TO RETURN TO WORK?

ISSUE TWO: DID CLAIMANTS VOLUNTARILY LEAVE THEIR EMPLOYMENT WITHOUT GOOD CAUSE MAKING THEM INELIGIBLE TO RECEIVE UNEMPLOYMENT BENEFITS?

ISSUE THREE: WERE CLAIMANTS DISCHARGED OR SUSPENDED FOR WORK–RELATED MISCONDUCT MAKING THEM INELIGIBLE TO RECEIVE UNEMPLOYMENT BENEFITS?

## ISSUE I

WERE CLAIMANTS UNEMPLOYED DUE TO A LABOR DISPUTE MAKING THEM INELIGIBLE TO RECEIVE UNEMPLOYMENT BENEFITS AFTER THE PICKET LINE WAS REMOVED AND CLAIMANTS UNCONDITIONALLY OFFERED TO RETURN TO WORK?

South Dakota's Unemployment Compensation law was enacted in 1936. The legislature's public policy goal was clear. It declared:

> Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which so often falls with crushing force upon the unemployed worker and his family.... The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of this state, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

1936 S.D. Sess.L. ch. 3 § 2. South Dakota's unemployment compensation statutes include a labor dispute disqualification provision. SDCL 61–6–19. The labor dispute disqualification allows the state to be neutral in labor disputes. *See In re Steelman,* 219 N.C. 306, 13 S.E.2d 544, 547 (1941).

> All interested parties who are involved in a claim for unemployment compensation ... must be dealt with on an impartial basis. The employment compensation fund should never be used to finance claimants who are directly involved in a labor dispute, nor should it ever be denied to claimants who are legally entitled to receive benefits ... None of the money accumulated in this fund should ever be dispersed for the purpose of financing a labor dispute nor should it be illegally withheld for the purpose of enabling an employer to break a strike.

*Lawrence Baking Co. v. Michigan Unemployment Compensation Commission,* 308 Mich. 198, 13 N.W.2d 260, 265 (1944); *See also, Salenius v. Michigan Employment Security Commission,* 33 Mich.App. 228, 189 N.W.2d 764 (1971); *In re Sarvis,* 296 N.C. 475, 251 S.E.2d 434 (1979).

South Dakota's labor dispute disqualification statute, SDCL 61–6–19 provides, in part:

> An individual is not entitled to any benefits for any week with respect to which the secretary finds that his total or partial unemployment is *due to a labor dispute.* (emphasis added).

Morrell argues that claimants' initial unemployment and the hiring of replacement workers was due to a labor dispute, making claimants ineligible for benefits. Claimants argue that when the picket lines were removed and an unconditional offer to return to work was made on November 4, 1987, they became unemployed due to lack of available jobs.

Although this is a case of first impression in South Dakota, several other states have addressed this issue and their opinions on their statutes offer guidance to this court. These cases can be grouped into two categories: "stoppage of work" statutes and "labor dispute in active progress" statutes.

Under "stoppage of work" statutes, the mere hiring of permanent replacement workers, even without an abandonment of the strike or unconditional offer to work,

lifts the labor dispute disqualification. *See Baugh v. United Telephone Co.*, 54 Ohio St.2d 419, 377 N.E.2d 766 (1978); *Ruberoid Co. v. California Unemployment Ins. App. Bd.*, 59 Cal.2d 73, 27 Cal.Rptr. 878, 378 P.2d 102 (1963).

Under "labor dispute in active progress" statutes, an employee who has been permanently replaced must also show that he has abandoned the strike and unconditionally offered to return to work in order to lift the labor dispute disqualification. *See In re Sarvis, supra; Special Products Company of Tenn. v. Jennings*, 209 Tenn. 316, 353 S.W.2d 561 (1961); *Skookum Co., Inc. v. Employment Division*, 24 Or.App. 271, 545 P.2d 914 (1976), *aff'd* at 276 Or. 303, 554 P.2d 520 (1976); *Burkart/Randall Division v. Daniels*, 268 Ark. 375, 597 S.W.2d 71 (1980).

Under either of these accepted interpretations, claimants are clearly eligible for benefits when they ended the strike and unconditionally offered to return to work.

The administrative law judge and the circuit court adopted the analysis found in the "labor dispute in active progress" statutes. *See Sarvis, supra, Special Products, supra, Randall, supra.* In those cases, the courts' analysis focused on the current cause of the unemployment and not on the originating cause. Morrell argues that this causation analysis is inapplicable because the labor dispute disqualification statutes construed in those cases differ from SDCL 61–6–19. In those cases, the labor dispute disqualification statutes disqualified workers while their employment was caused by a labor dispute in "active progress." SDCL 61–6–19 does not have the expressed "active progress" qualifier. However, while *Sarvis, supra, Special Products, supra,* and *Randall, supra,* contained active progress language in their statutes, the active progress qualifier was not material to the causation analysis in those cases.

In *Special Products, supra,* the Tennessee Supreme Court's focus was on the current cause, not the status, of the labor dispute. It noted:

We find here that the employer considered the strike ended and that thereafter the unemployment of these individuals was not due to the strike, but because there were no jobs available to them at the time the strike was ended since the jobs had previously been filled.

*Special Products*, 353 S.W.2d at 563.

Similarly, in *Sarvis, supra,* the North Carolina Supreme Court framed the issue as "whether Employer's inability to reinstate previously replaced Employees after they abandoned their strike and unconditionally offered to return to work *changed the cause of unemployment* and lifted the disqualification for benefits." (emphasis added). *Sarvis*, 251 S.E.2d at 437. In *Skookum, supra,* the Court of Appeals of Oregon concluded that claimants' continued unemployment was "not due to a 'labor dispute,'" but was caused by the unavailability of work because their positions had been filled by replacement workers. *Skookum, supra,* 545 P.2d at 916.

■ This current cause analysis is applicable to our statute, despite differences in statutory language. Under SDCL 61–6–19, claimants are not entitled to any benefits for any week in which their unemployment is due to a labor dispute. The words "due to" mean "caused by." *See Skookum, supra; Baugh v. United Telephone Company*, 54 Ohio St.2d 419, 377 N.E.2d 766 (1978). To determine if claimants' unemployment for any week is caused by a labor dispute, a current causation analysis is required under the plain reading of SDCL 61–6–19.

Morrell argues that the 1986 amendment of SDCL 61–6–19 precludes use of the causation analysis. Prior to 1986, SDCL 61–6–19 read:

An individual shall not be entitled to any benefits for any week with respect to which the director finds that his total or partial unemployment is *due to a stoppage of work which exists because of a labor dispute* ... (emphasis added).

Morrell claims that deletion of the word "exists" in 1986 omitted the active progress language from SDCL 61–6–19. This argument fails. First, as shown

above, the active progress language is not relevant to the causation analysis. Second, the word "exists" modified the phrase "stoppage of work," not "labor dispute." As such, it was not an active progress statute, but a stoppage of work statute.

■ It is a general rule that a statutory amendment is presumed to change existing law. *State v. Heisinger*, 252 N.W.2d 899 (S.D.1977). Prior to 1986, SDCL 61–6–19 was a stoppage of work statute. Under it, benefits were payable upon the mere hiring of replacement workers, even during a strike, because a stoppage of work no longer existed. Under SDCL 61–6–19 as amended, benefits are payable only if the worker is replaced and he abandons the strike and unconditionally offers to return to work. Thus, the 1986 amendment does reflect a restrictive change to existing law.

Additionally, the current cause analysis fully addresses the policy issues set forth by our legislature by addressing economic security while remaining neutral in labor disputes. Under the current cause analysis, benefits are not awarded during a labor dispute. Here, claimants honored a picket line in an attempt to gain labor concessions for the Sioux City local. Morrell held fast in its bargaining position. Ultimately claimants abandoned their strike and unconditionally offered to return to work.

■ Throughout this labor dispute, the state remained neutral by denying benefits to striking workers. Once the labor dispute ended, however, the policy of neutrality was no longer pertinent. At that point, the state's interest in averting the crushing force of economic insecurity due to the unemployment of hundreds of workers became vital. This interest compelled payment of unemployment benefits and was fully compatible with South Dakota's labor dispute disqualification statute.

Morrell would have us believe that the South Dakota legislature intended to adopt the most restrictive, unusual, and anti-labor labor dispute disqualification legislation in the United States. To give SDCL 61–6–19 that interpretation, this court would be completely ignoring our legislature's stated policy of alleviating the hardships of invol-untary unemployment. Further, this court would be ignoring the policy of neutrality in labor disputes, punishing workers by denying them unemployment benefits after a labor dispute has ended. This would result in the denial of benefits to claimants who are legally entitled to receive them. No other state has made this departure, no case law supports it, and language of SDCL 61–6–19 precludes it.

■ Finally, Morrell argues that claimants' fault in breaching a no strike provision of a collective bargaining agreement must be considered. In determining entitlement to unemployment benefits, however, the Department and the courts should not question whether the labor dispute was the fault of the employer or the employees. *Special Products, supra, citing Davis v. Aluminum Company of America*, 204 Tenn. 135, 316 S.W.2d 24 (1958). Injecting fault into the disqualification determination would place an impossible burden on Department. Unemployed workers need a prompt determination of their claim for benefits. Department is in no position to make a determination of fault at the time the claimants apply for benefits. As this case demonstrates, years may pass before an ultimate decision on fault is resolved. Hundreds of claims were filed starting in July of 1987 as a result of this labor dispute. It was not until March 14, 1988, that a "Judgment on Jury Verdict" was entered in the South Dakota Federal District Court determining that the labor dispute was prohibited by the collective bargaining agreement. That decision is now on appeal and is still not finally decided.

The decision of the circuit court affirming the award of benefits is affirmed.

## ISSUE II

DID CLAIMANTS VOLUNTARILY LEAVE THEIR EMPLOYMENT WITHOUT GOOD CAUSE MAKING THEM INELIGIBLE TO RECEIVE UNEMPLOYMENT BENEFITS?

■ Morrell argues that SDCL 61–6–13 disqualifies claimants from receiving bene-

fits because claimants voluntarily left their employment without good cause when they refused to cross the Sioux City Union's picket line. SDCL 61–6–13, provides:

> An unemployed individual who voluntarily without good cause left his most recent employment . . . is denied benefits.

This court has previously ruled that in order to establish a voluntary quit under SDCL 61–6–13, the employer must prove that the employee intended to terminate his employment relationship. *In re Johnson*, 337 N.W.2d 442 (S.D.1983). In *Johnson*, this court adopted the general rule that "absence from the job is not a leaving of work where the worker intends merely a temporary interruption in employment and not a severance of the employment relationship." *Id.* at 447. This rule is consistently applied throughout the country. *See Inter–Island Resorts, Ltd. v. Akahane*, 46 Haw. 140, 377 P.2d 715 (1962); *Powers v. Chizek*, 204 Neb. 759, 285 N.W.2d 501 (1979); *Allen v. Core Target City Youth Program*, 275 Md. 69, 338 A.2d 237 (1975); *Savastano v. Board of Revenue*, 99 N.J. Super. 397, 240 A.2d 172 (1968); *Vergeyle v. Employment Sec. Dept.*, 28 Wash.App. 399, 623 P.2d 736 (1981).

In this case, neither Morrell nor claimants believed that their employment relationship was severed. Morrell continued to treat claimants in all respects as employees who were not actively working. Since there was no intent by either party to sever the employment relationship SDCL 61–6–13 does not apply. The decision on this issue is affirmed.

### ISSUE III

WERE CLAIMANTS DISCHARGED OR SUSPENDED FOR WORK–RELATED MISCONDUCT MAKING THEM INELIGIBLE TO RECEIVE UNEMPLOYMENT BENEFITS?

■ Morrell argues that pursuant to SDCL 61–6–14, claimants were involved in work related misconduct disqualifying them from unemployment benefits. SDCL 61–6–14 provides:

> An unemployed individual who was discharged or suspended from his most recent employment . . . for misconduct connected with his work shall be denied benefits . . .

Claimants contend that SDCL 61–6–14 does not apply because they were not discharged or suspended. Morrell concedes that "none of the workers were discharged, suspended or disciplined by Morrell because of their participation in the strike." Given this admission, SDCL 61–6–14 does not apply to this case. The decision of the administrative law judge and the circuit court is affirmed on this issue.

The circuit court order affirming the decision of the South Dakota Department of Labor, Unemployment Insurance Division is affirmed. Pursuant to SDCL 61–5–29, the employer's experience-rating account shall be charged for benefits paid to the claimants.

MORGAN, and SABERS and MILLER, JJ., concur.

HENDERSON, J., dissents.

TUCKER, Circuit Judge, for WUEST, C.J., disqualified.

HENDERSON, Justice (dissenting).

I respectfully dissent.

SDCL 61–6–19 is very unique. A researcher cannot find another statute like it in the United States. Therefore, we must decide this case by employing statutory construction of this specific and very unique statute.

SDCL 61–6–19 provides (which is the statute under construction but is not recited in the majority opinion):

> *Benefits not payable for unemployment caused by labor dispute—Exceptions.* An individual is not entitled to any benefits for any week with respect to which the secretary finds that his total or partial unemployment is *due to a labor dispute* at the factory, establishment, or other premises at which he is or was last employed, provided that this section does not apply if it is shown to the satisfaction of the department that:

(1) He is not participating in or financing or directly interested in the labor dispute; and

(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the dispute, there were members employed at the premises at which the dispute occurs, any of whom are participating in or financing or directly interested in the dispute.

(3) He is locked out by his employer. If in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each department shall, for the purpose of this section, be considered a separate factory, establishment or other premises. (Emphasis supplied).

The Department of Labor disqualified claimants from benefits between May 1, 1987 through November 4, 1987, because a labor dispute caused the unemployment. That dispute is not before this Court. After the picket line was removed on November 4, 1987, the Claimants unconditionally offered to return to work. However, Morrell had to keep private enterprise flowing. Morrell had to keep the plant alive. Morrell had to save the plant and its super structure. If it did not, the Claimants would have no jobs to which they could return. Replacements were hired as "permanent replacement workers." It was either close the Sioux Falls plant or hire replacements. Reference is made to *John Morrell & Co. v. Local 304A UFCW et. al.,* No 86–4126, 86–4135 (DSD Mar. 14, 1988) in the South Dakota Federal District Court. Said case adjudicated that the strike engaged in by the claimants was a strike prohibited by the written agreement of Morrell and the Union, which included a "no-strike" provision. Damages were awarded to Morrell for the Union's breach. This lawsuit is spawned by hundreds of former striking workers who filed unemployment claims. Some 600 strikers were denied benefits "due to a labor dispute." It was determined that not "until the labor dispute ended" were they eligible to receive unemployment benefits.

After the November 4, 1987, unconditional offer to return to work, there were more than 1,000 strikers who began to file either new or additional claims for unemployment benefits. Morrell did return illegal strikers to work on a "senior-qualified basis"; not all could be returned to work because there were jobs filled by replacement workers.

The Department of Labor ruled that these 1,000 strikers (and more) (1) Were not discharged for misconduct; (2) Did not voluntarily quit; and (3) After November 4, 1987, were not unemployed due to a labor dispute. I disagree with the Department of Labor and also the circuit court's decision affirming the Department of Labor.

SDCL 61–6–19 disqualifies unemployment compensation where partial unemployment is due to a labor dispute. This language was created by an amendment in the State Legislature in 1986. It is a recent amendment and we should pay heed to it. We must determine the cause of the unemployment under our unique statute. The National Labor Relations Board refused to issue a complaint against Morrell. We may take judicial notice thereof. *See, generally, State v. Aspen,* 412 N.W.2d 881 (S.D.1987); *Alexander v. Solem,* 383 N.W.2d 486, 489 (S.D.1986); 31 C.J.S. Evidence § 50(2) (1964). Said Board determined that the May 1, 1987, strike by Claimants was an "economic strike." There is no doubt that the Claimants walked off their jobs by virtue of a strike on May 1, 1987. A South Dakota federal jury found such action to be an open violation of a no-strike provision in the collective bargaining agreement then in force.

Morrell, attempting to keep the plant open to avoid financial disaster, hired replacement workers. Claimants could have worked but refused to work. The National Relations Board ruled that Morrell lawfully utilized correct rehiring procedures. *Aspen, Alexander, id.*

These Claimants were unemployed "due to" a labor dispute which they, themselves, initiated in express violation of their written word.

This State enacted, in 1936, the Unemployment Compensation Law. The intent was to establish reserves "for the benefit of persons unemployed through no fault of their own" and to protect against the hazards of "involuntary unemployment." Only by denying Claimants these unemployment compensation checks, can and will the general policy of the State Legislature be implemented.

Our state law does not disqualify where unemployment is "due to a labor dispute in active progress." Rather, our statute disqualifies unemployment where it is "due to a labor dispute."

The circuit court erred in analyzing five foreign courts' "active progress" thesis, throughout our nation. Those five courts' determination was that the strike terminated on the day the offer to return to work was made. After all, these courts reasoned, if the strike terminated, the cause of the unemployment from that day forward could not be a labor dispute in active progress. These courts were caught up with a theory of "active progress." They have their statutes to consider; we have ours. They determined that the labor dispute was no longer "in active progress" because the Claimants had offered to return to work. Thus, the cause of the unemployment was something other than a labor dispute in active progress. We have no "active progress" statute or theory or similar public policy in this state. Therefore, those five cases are inapposite.

Had the Claimants not put into motion, by their own actions, the chain of events which occurred, today those Claimants would still be working at Morrell. There is testimony from the Claimants themselves that they simply are not working because of their participation in the unlawful labor dispute which they instituted. And now confirmed, in law, by a federal judgment.

We must apply legislative enactments as written. *In Petition of Famous Brands, Inc.*, 347 N.W.2d 882 (S.D.1984). The purpose of unemployment compensation is to relieve the monetary distress of unemployment, not to pay people who refuse to work when a job is before them and their em-

ployer has provided a place to work. This is not this writer's philosophy; it is the spiritual pronouncement of our State Legislature. It is not my role to determine the equities between the employer and the employees; rather, it is to adjudicate, under the facts, the eligibility of unemployment compensation under the terms of South Dakota's statutes. This is a dangerous decision to the Unemployment Compensation Fund for it clearly establishes a precedent which approves a violation of a contractual agreement and perforce approves of unemployment compensation benefits. Thus, it is a total disregard of the specific law of this state. Clearly, the unemployment was "due to a labor dispute." No rubbing or scrubbing can change that fact. Common sense dictates that Claimants should not receive unemployment compensation at the expense of their employer when they voluntarily walked off their jobs in violation of their written contract.

## HOW DID IT ALL BEGIN?

For each ending, there is always a creation, or beginning. This entire matter arose when a sister Union (Local 1142), which had members employed at Morrell's plant in Sioux City, Iowa, engaged in a tremendous dispute with Morrell over wages and working conditions at the Sioux City plant. Members of the Sioux City Local implanted their Iowa strife into South Dakota soil by creating a picket line at Morrell's plant at Sioux Falls. Violence ensued. South Dakota citizens who tried to cross the picket line were assaulted. Violence ceased after an injunction was issued by the Second Judicial Court against the Sioux Falls Local. In fact, the Union was fined for contempt for failure to obey the injunction. Here, a contract is more honored in its breach, than its observance. To me, that's bad justice. Therefore, I dissent.