Susan REED, Bruce Moen, Ed Beyer, Judith M. Freeland, Richard A. Flieth, Charles Hanson, Ronald B. Gadberry, Jill DeNucci, Anne McSparron, Mary Hanson, Helen Goodfellow, Keith Meyer, Beverly Nelson, Julie M. Zerface, Petitioners and Appellees,

v.

**HILLSBORO PUBLIC SCHOOL DISTRICT NO. 9, Respondent and Appellant.**

Civ. No. 900392.

Supreme Court of North Dakota.

Nov. 12, 1991.

Chapman & Chapman, Bismarck, for petitioners and appellees; argued by Michael Geiermann.

Fleck, Mather & Strutz, Bismarck, for respondent and appellant; argued by Warren H. Albrecht, Jr.

MESCHKE, Justice.

Hillsboro Public School District No. 9 appealed from a judgment granting the petition of Susan Reed, Bruce Moen, Ed Beyer, Judith M. Freeland, Richard A. Flieth, Charles Hanson, Ronald B. Gadberry, Jill DeNucci, Anne McSparron, Mary Hanson, Helen Goodfellow, Keith Meyer, Beverly Nelson, and Julie M. Zerface for a writ of mandamus and ordering the District to restore $63,950.39 from its building fund to its special reserve fund. We reverse.

Upon review of the District's financial report for July 1, 1988, through June 30, 1989, petitioners discovered "that there was a transfer made from the special reserve fund to the capital expenditures fund of approximately $63,000.00." Petitioners sought mandamus to require replacement of "funds taken from the special reserve fund and placed into the building fund."

The trial court found: (1) that at a regular school board meeting on September 8, 1988, the District "passed a motion to request the county treasurer to transfer 50 percent of the special reserve fund of the ... District to the district's general fund"; (2) that the sum transferred was $68,804.31 including $4,853.92 in interest that was "not subject to the issues in this lawsuit"; (3) that the transferred money "was spent for the construction and maintenance of school district buildings"; and (4) that "[n]o evidence was presented to the Court that collections from taxes levied for the 1988–89 fiscal year were insufficient to meet the requirements of the budget for teacher's salaries, heat, light, and fuel." The court concluded that, in making the transfer, the District "failed to comply with the provisions of N.D.C.C. Section 57–19–06 and therefore said transfer is illegal." The court ordered the District to "transfer $63,950.39 from its current building fund to the special reserve fund." The District appealed.

Those seeking mandamus must show a clear legal right to performance of the act to be compelled.

A writ of mandamus may be issued "to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station" (§ 32–34–01, N.D.C.C.) "when there is not a plain, speedy, and adequate remedy in the ordinary course of law" (§ 32–34–02, N.D.C.C.). "A petitioner for a writ of mandamus must show a clear legal right to performance of the act sought to be compelled and the denial of a writ will not be overturned unless the trial court abused its discretion." *Fargo Beverage Co. v. City of Fargo*, 459 N.W.2d 770, 773 (N.D.1990).

*Peterson v. McKenzie County Public School Dist. No. 1*, 467 N.W.2d 456, 458 (N.D.1991). School boards have "extensive discretionary powers relating to the raising, management, and disposition of funds for the operation and maintenance of schools." *Id.* at 458. A school district is a municipality for purposes of NDCC Title 57. NDCC 57–02–01(9). Therefore, "there is a range of reasonableness within which a [school district's] manner and means of exercising [its] powers will not be interfered with or upset by the judiciary." *Peterson*, 467 N.W.2d at 458. This framework guides our examination of the District's transfer of funds in this case.

Since 1943, each school district has been authorized to set aside and maintain a special reserve fund "which shall not exceed in amount at any one time the sum which could be produced by a levy of the maximum mill levy allowed by law in that district for that year." NDCC 57–19–01. This fund is kept by the county treasurer, but income or interest earned on it is annually paid to the district's general fund. NDCC 57–19–02. Accumulations in this special reserve fund are derived from unspent funds of the district set aside for that

purpose, NDCC 57–19–03, and from an annual tax levy of three mills "in addition to tax levy limitations otherwise specified by law." NDCC 57–19–04. This special reserve fund "shall not be considered" by the school district in determining its annual budget. NDCC 57–19–05. Here, the District withdrew $63,950.39 from its special reserve fund for its general fund in September 1988, on the same date that it also funded building repairs and maintenance in a much larger amount, including over $63,000 from its general fund. Since we held in *Peterson v. McKenzie County Public School Dist. No 1* that a school district is authorized to transfer money from its general fund to its building fund, the question in this case boils down to whether the District was authorized to withdraw funds from its special reserve fund for its general fund.

Until 1987, use of the special reserve fund was governed by an earlier version of NDCC 57–19–06, thus:

> Whenever collections from the taxes levied for the current budget are insufficient to meet the requirements of such budget for teacher salaries, heat, light, and fuel, a majority of the governing body of the school district, by resolution, may provide for the issuance of vouchers directed to the county treasurer, drawing on funds in said special reserve fund of such district. Such voucher may be substantially in the same form as a warrant, but shall not be a negotiable instrument, and shall direct the county treasurer to pay over to the school district from the special reserve fund the amount of money specified in the voucher. Subject to the limitations in the next section, the county treasurer shall transfer from the special reserve fund to the school district general fund the sum so specified, and shall enter such voucher in a book to be known as the special reserve fund voucher register in the order in which they are issued.

The amount of outstanding vouchers is limited and their repayment is provided through redemption from unencumbered taxes that have been levied for the general fund of the school district but that are uncollected at the time the voucher is issued.

> *Limitation on amount drawn from fund—Tax collections used to restore fund.* The amount of outstanding, unredeemed vouchers shall never exceed in the aggregate a sum equal to eighty-five percent of the unencumbered uncollected taxes for the current and fifty percent for the four preceding years which are apportionable to the general fund of such school district. Such vouchers, in the hands of the county treasurer, shall be redeemed from the collections of such uncollected taxes....

NDCC 57–19–07 (part). This statutory structure was changed in 1987.

In 1987, NDCC 57–19–06 was temporarily amended for only two years, and thereafter in each of the 1989 and 1991 legislative sessions the amendment was again carried forward for another two years. This amendment added and carried forward a separate subsection to authorize additional amounts to be withdrawn from the fund without any provision for repayment.

> *Special reserve fund—How and when used.*
>
> 1. Whenever collections from the taxes levied for the current budget are insufficient to meet the requirements of the budget for teacher salaries, heat, light, and fuel, a majority of the governing body of the school district, by resolution, may provide for the issuance of vouchers directed to the county treasurer, drawing on funds in the special reserve fund of the district.... Subject to the limitations in section 57–19–07, the county treasurer shall transfer from the special reserve fund to the school district general fund the sum so specified, and shall enter the voucher in a book to be known as the special reserve fund voucher register in the order in which they are issued.
>
> 2. The governing body of the school district, by resolution, may withdraw without repayment fifty percent of the funds from the special reserve fund of the school district.

**240**

S.L.1987, ch. 38, § 12. It is this version of NDCC 57–19–06 that we interpret here.

The critical question is whether the District was authorized to withdraw funds from the special reserve fund in 1988 for any purpose other than "to meet the requirements of the budget for teacher salaries, heat, light, and fuel," as restricted in subsection 1, or whether the withdrawal authorization in subsection 2 is separate and independent from that restriction. The trial court construed the statute to mean that a withdrawal of funds under subsection 2 is limited by subsection 1. We disagree.

■ In construing a statute, "consideration should be given to the ordinary sense of the statutory words, the context in which they are used, and the purpose which prompted their enactment." *County of Stutsman v. State Historical Society,* 371 N.W.2d 321, 327 (N.D.1985). We recently summarized a number of related tenets of statutory construction:

> The interpretation of a statute is a question of law, fully reviewable by this court. *Ladish Malting Co. v. Stutsman County, Etc.,* 351 N.W.2d 712 (N.D.1984). The primary purpose of statutory construction is to ascertain the intent of the Legislature. *E.g., County of Stutsman v. State Historical Society,* 371 N.W.2d 321 (N.D.1985). The Legislature's intent initially must be sought from the language of a statute. *Id.* Unless words in a statute are defined in the code, they are to be given their plain, ordinary, and commonly understood meaning. Sections 1–02–02, 1–02–03, N.D.C.C.; *County of Stutsman v. State Historical Society, supra.* If the language of a statute is ambiguous or of doubtful meaning, extrinsic aids may be used to interpret the statute. *Id.*

*Kim–Go v. J.P. Furlong Enterprises, Inc.,* 460 N.W.2d 694, 696 (N.D.1990). "It is of course axiomatic that our construction of any statute must 'effect[ ] its objects and ... promot[e] justice.' Section 1–02–01, N.D.C.C." *Peterson v. McKenzie County School Dist. No. 1,* 467 N.W.2d at 458. Among the extrinsic aids useful in construing an ambiguous statute to determine legislative intent are the object sought to be attained, legislative history, and administrative construction of the statute. NDCC 1–02–39.

■ The text and structure of NDCC 57–19–06 do not tell us whether a withdrawal without repayment of fifty percent of the special reserve fund under subsection 2 is or is not subject to the limiting condition in subsection 1. Subsection 1 directs that an "issuance of vouchers ... drawing on funds in the special reserve fund" may occur only "[w]henever collections from the taxes levied for the current budget are insufficient to meet the requirements of the budget for teacher salaries, heat, light, and fuel." A legislative intention to make non-repayable withdrawals subject to the same limitation for issuance of repayable vouchers could easily have been made clear by placing the withdrawal authorization directly in subsection 1, instead of separating it from that limitation. To construe NDCC 57–19–06, we must examine other evidence of legislative intent.

In 1987, the Legislature temporarily amended NDCC 57–19–06 by making the existing statute subsection 1 and adding the separate subsection 2 as a new provision. S.L.1987, ch. 38, § 12. The temporary amendment was effective through June 30, 1989. S.L.1987, ch. 38, § 17. The same temporary amendment was reenacted in 1989 to be effective through June 30, 1991. S.L.1989, ch. 701, §§ 1 and 2. Again in 1991, the same amendment was extended through June 30, 1993. S.L.1991, ch. 656, §§ 1 and 2. Nothing in the legislative history of this separate subsection 2 expressly says that a non-repayable withdrawal is subject to the same conditions as repayable vouchers.

The minutes of the Senate Education Committee hearing of April 15, 1987 do little to clarify:

> The amendment states that the district will only pay back 50% of the money they take out of the special reserve fund. Rep. Hoffner stated that if we could use the school construction fund, we could use it as a loan rather than a loan. Sena-

tor Kelsh stated he could see nothing wrong with using part of the fund for using the construction part of the electronic media projects.... Howard Snor[t]land stated the reason the way the special reserve fund is set up the way it is now is for school districts to help them get money out to pay salaries, lights, electricity, fuel, and etc. It would be in a case of an emergency. Three mills are set up aside from the total mills. These funds, in current law, have to be repaid back. Senator Kelsh commented that we have to realize that this money is their money. Senator Freborg commented the advantage of this amendment would be they only have to pay ½ of the money back.

But the minutes of the Senate Education Committee hearing of March 31, 1989 imply that withdrawals under subsection 2 were not intended to be subject to the former limitations:

JOE WESTBY, NDEA spoke in favor of the bill, stating that they are supporting this because it gives the school district another mechanism to deal with fluctuation in revenue, such as they experience in August when funds were cut by executive order.

MR. AL KOPPANG, DPI spoke in favor of the bill stating that a number of school districts have utilized this law. Previous to the 1987 session, this fund could only be used for heat, lights, and salaries.

The minutes of the House Education Committee hearing of March 8, 1989 carry a similar implication:

*Sen. Clayton Lodoen, Dist. 13, West Fargo,* sponsor, testified in support.... We need to be able to get more money for projects, etc. We want authority to withdraw from special reserve funds.

\*   \*   \*   \*   \*   \*

Rep. Wilkie stated he is voting against the bill because it is transferring money from special funds; it is turning special reserve into the general funds.

The minutes of the House Education Committee hearing of March 11, 1991 state:

*Rep. Larson:* We need this to give flexibility to the school districts.... It wouldn't be needed if we got adequate foundation aid payments.

\*   \*   \*   \*   \*   \*

*Dr. Richard Ott, North Dakota School Boards Association,* testified in support.... They need the flexibility and accessibility to the money.

The minutes of the Senate Education Committee hearing of March 18, 1991 state:

*Sen. Lindgren,* cosponsor, ... In these current economic and fiscal times it's important to give a school district this kind of flexibility.

\*   \*   \*   \*   \*   \*

*Marvin Leidal,* Superintendent in West Fargo, testified in support of HB 1608. Having access to half of the principal in the special reserve fund has been very helpful. If they wouldn't have this, they would most likely have had to make $150,000 in cuts in each of the past three years than what was already made.

Thus, testimony during legislative committee hearings on the temporary amendments generally reflects an understanding that subsection 2 provides school boards with greater "flexibility" in using special reserve funds because those withdrawals are not subject to the same conditions of use and repayment as vouchers under subsection 1. That conclusion is especially supported by the testimony of Mr. Koppang of the Department of Public Instruction that "[p]revious to the 1987 session, this fund could only be used for heat, lights, and salaries"; Senator Lodoen's testimony that "[w]e need to be able to get more money for projects, etc."; and Representative Wilkie's testimony, in opposition to the legislation, that "it is turning special reserve into the general funds."

From our examination of NDCC 57-19-06 and the legislative history of the temporary amendments adding the separate subsection 2, we conclude that a withdrawal without repayment of fifty percent of the funds in a school district's special reserve fund pursuant to subsection 2 is not subject to the limiting condition in subsection 1

that tax collections must be "insufficient to meet the requirements of the budget for teacher salaries, heat, light, and fuel." Therefore, the District was authorized to withdraw funds from its special reserve fund for its general fund without repayment and without preconditions.

█ Because the District's withdrawal of funds from its special reserve fund for its general fund was within its "discretionary powers relating to the raising, management, and disposition of funds for the operation and maintenance of schools" (*Peterson*, 467 N.W.2d at 458), the District could not be compelled to repay them. We therefore conclude that the trial court erred in granting the petitioners a writ of mandamus and ordering the District to transfer funds from its building fund to its special reserve fund to repay the withdrawal.

The judgment is reversed.

ERICKSTAD, C.J., and VANDE WALLE and GIERKE, JJ., concur.

LEVINE, Justice, dissenting.

In reaching its result, the majority has breached a number of statutory-construction thou-shalt-nots. I list the most obvious: Thou shalt not: (1) overlook the whole, of which the statute at issue is a part, or the purpose of the whole; (2) render meaningless any provision of a statute; (3) construe one section of a statute to implicitly repeal another; (4) construe a statute to create a conflict between its sections. NDCC §§ 1–02–38; 1–02–39. *E.g., Westman v. N.D. Workers Comp. Bureau,* 459 N.W.2d 540 (1990); *Speedway, Inc. v. Job Service,* 454 N.W.2d 526 (N.D.1990); *Walsvik v. Brandel,* 298 N.W.2d 375 (N.D.1980); *State v. Mees,* 272 N.W.2d 61 (N.D.1978). Because I favor a construction that would advance, not undermine, each of those canons of statutory construction, I respectfully dissent.

In *Peterson v. McKenzie County School Dist. No. 1,* 467 N.W.2d 456 (N.D.1991), we construed a variety of statutes to allow a school board to transfer funds from its general fund to its building fund. Somehow, the majority tries to justify its un-

sound construction of section 57–19–06, NDCC, by relying on *Peterson,* which, of course, did not involve section 57–19–06, NDCC, at all and did not involve the question at issue here, whether there may be unrestricted use of special reserve funds.

Section 57–19–06 is found in a chapter that carefully authorizes, identifies and segregates special reserve funds. NDCC §§ 57–19–01, 57–19–02. Only certain kinds of funds may be deposited in a special reserve fund. NDCC § 57–19–03. Section 57–19–04 authorizes a tax levy, as well, to establish, maintain or replenish a special reserve fund and limits the levy to three mills. Furthermore, the special reserve fund is not to be considered in determining the budget or the amount to be levied for each school fiscal year. NDCC § 57–19–05. Finally, section 57–19–06 addresses "how and when" the special reserve fund is to be used. These statutes, and the chapter in which they are found, distinguish this case from *Peterson.*

In *Peterson,* we carefully noted that, unlike the use of general funds at issue in that case, the use of special funds was specifically restricted by a number of statutes. *Peterson* at 460. Section 57–19–06, NDCC, is one of those statutes that restricts the use of special funds. In removing that restriction, the majority has amended the statute to disarm subsection (1) and to implement a policy that is a dramatic departure from the legislature's traditional careful and conservative treatment of special funds.

In support of its construction, the majority relies on, and draws selective inferences from, ambiguous legislative history. However, it is clear that even within the quoted legislative history set out in the majority opinion, there are contrary inferences as well. For example, Senator Freborg believes that "the advantage of the amendment would be they only have to pay one-half of the money back." Minutes of Senate Education Hearing April 15, 1987. So, too, I can find favorable inferences for my view from legislative history that is not set forth in the majority opinion. However, candor impels the conclusion that the legis-

lative history is so rife with competing inferences that one can find some semblance of support for any position! I, therefore, place no confidence whatsoever in the legislative history and deem it wholly unhelpful.

Instead, I rely on sections 1–02–39 and 1–02–38, NDCC, and, in particular, look to the purpose of the statute and the chapter in which it is codified, the consequences of a particular construction and the need to give meaning and effect to every part of the statute. Looking then, in that fashion, at section 57–19–06, NDCC, subsection (1) tells us when special funds may be used. "Whenever collections from the taxes levied for the current budget are insufficient to meet the requirements of the budget for teachers salaries, heat, light, and fuel ...," special reserve funds may be used. As a corollary of that statutory pronouncement, special funds cannot be used if there are sufficient general funds for teachers' salaries and utilities.

Subsection (2) was added to section 57–19–06, NDCC, in 1987. A statutory amendment is generally presumed to change existing law. *John Morrell & Co. v. Dept. of Labor*, 460 N.W.2d 141 (S.D.1990). Section 57–19–06, NDCC, in its pre–1987 life, made no provision for less than full repayment of borrowed funds to the special reserve fund. Subsection (2) now tells us that borrowed special funds need only be half repaid. Thus, subsection (2) eases the financial burden of struggling school districts by requiring only half repayment, rather than full repayment, of borrowed special reserve funds. Subsection (2), on its face or otherwise, does not remove the threshold conditions of borrowing special funds that there be insufficient general fund moneys to meet salaries, heat, light and fuel expenses. By ruling that subsection (2) does eliminate those requirements, the majority has effectively repealed section 57–19–06(1), NDCC. Yet, repeals by implication certainly are not favored and to overcome the presumption against an implied repeal, it must be shown that there is an irreconcilable conflict between two provisions. *E.g.*, *Walsvik v. Brandel, supra*. But, construing the two subsections as I propose, har-

monizes them and avoids conflict. It also gives each meaning and recognizes that the law neither does nor requires idle acts. *See County of Stutsman v. State Historical Soc.*, 371 N.W.2d 321 (N.D.1985).

We should construe the language of subsection (1) to establish the conditions precedent for a transfer of special reserve funds, and subsection (2) to establish the terms of repayment of borrowed special reserve funds. So construed, both subsections are harmonized, both are given meaning and effect, both are read as a whole, and both are energized to promote the legislature's intent to protect the special reserve fund's purpose while alleviating the financial problems of school boards. That way, special funds will be used for teachers salaries and utilities, not for other purposes which the legislature has deemed less critical.

I would affirm the judgment of the trial court and so I dissent.