1997 SD 48

**Robert BRIM, Applicant and Appellant,**

v.

**SOUTH DAKOTA BOARD OF PARDONS
AND PAROLES, Appellee.**

No. 19477.

Supreme Court of South Dakota.

Argued Oct. 23, 1996.

On Reassignment March 11, 1997.

Decided April 30, 1997.

Rehearing Denied June 6, 1997.

John M. Wilka of Wilka, Haugen & Kirby, P.C., Sioux Falls, for applicant and appellant.

David O. Carter, Special Assistant Attorney General, Sioux Falls, for appellee.

GILBERTSON, Justice (on reassignment).

[¶ 1.] In 1958, Robert Brim was convicted of manslaughter in Stanley County and sentenced to life imprisonment. The original court file indicates that Brim shot Irene Stoesser, killing her and her unborn child. Stoesser and her husband employed Brim on their farm near Hayes, South Dakota. Although Irene's three-year-old daughter was also shot to death and a four-year-old son was injured in the same incident, Brim was only charged with Irene's death.[1] He pled guilty and was sentenced to life imprisonment.

[¶ 2.] Brim began to serve his sentence on November 1, 1958. No parole eligibility date was ever set for him. His only documented request was submitted to the Board of Pardons and Paroles on November 12, 1993. The Board denied the request. We affirm

---

1. Stanley County placed detainers or hold orders in Brim's penitentiary file, presumably to preserve other potential charges for the crimes against the Stoesser children. In 1974, Brim filed a motion to dismiss any other criminal charges pending against him. An Order of Dismissal was entered in May of 1974 on the grounds that Brim did not receive a speedy trial, and apparently, the holds were then removed. Correspondence in the record dated in 1965 and 1966 seems to indicate that Brim made even earlier attempts to have the holds removed from his file.

the decision of the circuit court upholding the Board's decision.

## ANALYSIS AND DECISION

[¶ 3.] **Whether, at the time of his 1958 sentence to life imprisonment, state law required that a parole eligibility date be set for Brim?**

■ [¶ 4.] Whether Brim had a right to be assigned a parole eligibility date depends upon the statutory framework as it existed in 1958. "The proper construction to be given a statute is a question of law which is fully reviewable. Accordingly, the questions presented are reviewed de novo." *Estate of Chilton*, 520 N.W.2d 910, 912 (S.D.1994); *See also In re Famous Brands, Inc.*, 347 N.W.2d 882, 884 (S.D.1984) (citations omitted).

■ [¶ 5.] We conclude that while South Dakota did at one time statutorily allow for parole of persons sentenced to life imprisonment, this opportunity existed only for persons sentenced prior to July 1, 1913. As Brim was not sentenced until November 1, 1958, he cannot claim any denial of any right to apply for parole.

[¶ 6.] In 1911 the Legislature enacted what was designated as Chapter 198 of the 1911 Session Laws.[2] Section 1 of that act established the right of a prisoner serving a life sentence to apply for parole.

Whenever the governor shall have received such recommendation above provided for, and is satisfied that any convict has been confined in the penitentiary for a sufficient length of time to accomplish his reformation, and that such convict may be temporarily released without danger to society, and is satisfied that permanent and suitable employment has been secured for such convict in some county of the state where he will be free from criminal influences, the governor shall issue an order to the warden that such convict shall be temporarily released from the penitentiary and allowed to go to said county. Provided, that no convict shall be paroled until he shall have served one-half of the time for which he was sentenced, allowing time earned for good behavior.

*And Provided further, that in case of convicts serving under life sentence, such convict may be paroled when he has served at least thirty years of time for which he was sentenced, deducting therefrom time earned for good behavior.* (Emphasis added.)

1911 S.D. Sess.L. ch. 198 § 1.

[¶ 7.] Section 2 of the same statute dealt with the Governor issuing a pardon. It provided in part:

Provided further, that in case the paroled convict is one who is serving under a life sentence, that such convict shall not in any event be given a pardon or final release until such convict has faithfully complied with the terms of his parole for a period of at least five years.

1911 S.D. Sess.L. ch. 198 § 2.

[¶ 8.] Thus, as of July 1, 1911, a person serving a life sentence could, under section 1 of this statute, be eligible for parole when the prisoner had served at least 30 years, and further under section 2, could be fully pardoned for the crime in an additional five years after the granting of the parole.

[¶ 9.] Apparently, the Legislature had second thoughts about the wisdom of its 1911 enactments as, at its very next session in 1913,[3] it amended Section 1 of the above-cited 1911 statute to read as follows:

Whenever the governor shall have received such recommendation above provided for, and is satisfied that any convict has been confined in the penitentiary for a sufficient length of time to accomplish his reformation, and that such convict may be temporarily released without danger to society, and is satisfied that permanent and suitable employment has been secured for such convict in some county of the state

---

2. Historically there was no parole in South Dakota until 1905 when it was created by § 4 of ch 144 of the 1905 Session Laws. However the statutes were silent as to the applicability of parole for prisoners serving life sentences until 1911.

3. At that time, the South Dakota Legislature met every other year.

where he will be free from criminal influences, the governor shall issue an order to the warden that such convict shall be temporarily released from the penitentiary and allowed to go to said county. *Provided,* That no convict, except convicts given an indeterminate sentence, shall be paroled until he shall have served one-half of the time for which he was sentenced allowing time earned for good behavior. And *Provided,* Further, that any convict upon whom has been imposed an indeterminate sentence and who has served the minimum of such sentence, allowing time earned for good behavior, may be paroled by the governor as herein provided. (Emphasis original.) [4]

1913 S.D. Sess.L. ch. 287 § 1. This amendment reflects only two changes to the 1911 statute. The 1913 Legislature dropped the 1911 provision allowing parole for a life prisoner after serving 30 years and instead replaced it with reference to prisoners who were sentenced to an indeterminate sentence. Thus, as of the effective date of the 1913 amendment to section 1 of the 1911 act, that being July 1, 1913, the right of a person sentenced to life imprisonment after July 1, 1913 to apply for a parole after 30 years, did not exist.

[¶ 10.] Yet the Legislature in 1913 had the remaining question of what to do with those prisoners who had been sentenced to life imprisonment prior to that date and had a vested right to parole consideration under the 1911 statute. *Cf. Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *People ex rel. Jones v. Russi,* 199 A.D.2d 1043, 608 N.Y.S.2d 914 (1993). Under section 2 of the 1911 statute, those persons had been given the right to apply for a full pardon after serving 30 years of their sentence, obtaining parole and convincing the governor that for at least five years after

parole, their exemplary conduct should allow them a full pardon. To address this situation, the Legislature left intact section 2 of the 1911 act. Section 2 of the 1911 act is carried forward to section 5404 of the 1919 code, and subsequently, to section 13.5302 of the 1939 code which was in effect when Brim was sentenced in 1958. At that point the statute read:

> No pardon shall be granted under this section in any case where the sentence of the court is imprisonment for life or for a longer term than two years without application to and recommendation by the Board of Pardons in compliance with the laws and regulations governing the proceedings of such Board; provided further, that in case the paroled convict is one who is serving under a life sentence, such convict shall not in any event be given a pardon or final release until such convict has faithfully complied with the terms of his parole for a period of at least five years.[5]

SDC 13.5302.

[¶ 11.] The reason for retaining section 2 of the 1911 act on the books this length of time was not to continue to allow parole for persons serving a life sentence who were sentenced after July 1, 1913, but was rather to deal with those persons serving a life sentence who were sentenced prior to that date and had a statutory right to apply for a pardon. The earliest anyone could have reached that status was 35 years after sentencing, which would have allowed a person sentenced in the first six months of 1913 to apply for a pardon, under a best case scenario, in 1948.

[¶ 12.] The subsequent inclusion of the 1913 statute in the next codification of 1919 is consistent with this analysis. Section 1 of the 1911 session laws as amended in 1913 is found at section 5398 of the 1919 Code under

---

4. This statute later became SDRC 5398 of the 1919 Code. Subsequently it became SDCL 23–60–5 and 23–60–12 in the 1967 Code.

5. In the 1967 Code, it became SDCL 23–60–15. It was amended by chapter 186 of the 1978 session laws to its current version, which is found at SDCL 24–15–4. Since 1978 it has provided: "A person sentenced to life imprisonment is not eligible for parole by the board of pardons and paroles." Chapter 1986 of the 1978 session laws was a comprehensive overhaul of the entire parole system of which SDCL 24–15–4 was but a single provision. This overhaul was not surprising as it falls on the heels of the 1976 revision of the entire criminal code.

the title, "Governor May Parole." Section 2 of the 1911 session laws, which is the statute upon which Brim now relies, is found at section 5404 under the title, "Governor May Pardon." In 1919 there were still numerous legislators who had served in the 1913 Legislature and knew what had been passed in 1913. (*See* 1993 South Dakota Legislative Manual (Blue Book) pp. 245–48 and 257–60).

[¶ 13.] In the 1939 Code, section 1 of the 1911 session laws became SDC 13.5301. As amended in 1925 and 1931, it now contained a detailed formula for when a prisoner was eligible for parole. Noticeably missing was any calculation on how to determine parole eligibility for prisoners serving a life sentence or even a reference to them.[6] Section 2 of the 1911 session laws became a separate statute, SDC 13.5302, (see ¶ 10, *supra* ), generally dealing with pardons and setting no formula for the parole of life prisoners.

[¶ 14.] Brim argues that the subsequent title of SDCL 23–60–15 adopted in the 1967 codification points towards retention of parole for life prisoners after 1913, as it is entitled, "Minimum duration of parole under life sentence." Obviously by 1967 there were no holdover legislators from 1913 who were aware of the intent of the law at the time it was amended in that year.

[¶ 15.] Neither does the title of the 1967 act provide any authority that there was an intent of that Legislature to amend the 1939 statute or its predecessors. This is based upon a fundamental change in the law of statutory construction which also occurred in 1939. At the time of the 1919 Code, the title of the statute was considered to be part of the statute. This Court in *State v. Johnson,* 24 S.D. 590, 124 N.W. 847, 850 (1910), a case dealing with criminal procedure, held:

> [T]he general rule of construction as to title and headings ... is as follows: 'Especially may the title be consulted as an aid to interpretation where, as is the case in many states, the Constitution provides that the subject of the act shall be expressed in the title, for under such constitutional provisions the title becomes a part of the act itself. ...' It seems clear, therefore, that in construing words and phrases used in the statutes the court should give effect to the headings according to their plain import.

However, with the adoption of the 1939 Code, there was to be a complete reversal of this rule of construction for statutes contained in that Code. SDC 65.0202(3) states, "source notes, cross-references, and *titles,* whether designating entire titles, parts, chapters, sections, or subdivisions, constitute *no* part of any statute." (emphasis added). This was carried forward to the 1967 SDCL via SDCL 2–14–9. Thus, the statutory titles relied upon by Brim in the 1939 and 1967 codes which he claims to support his position are not part of the statute, while the titles in the 1919 code were part of that statute.

[¶ 16.] Further support for our interpretation is found in the Legislature's treatment of good time. In section 5456 of the 1919 Code, good time eligibility existed for all prisoners except those serving life sentences. This lack of eligibility for good time is logical

---

6. SDC 13.5301 read in part, "[T]he Governor shall issue an order to the Warden of the penitentiary that such convict shall be paroled and temporarily released from the Penitentiary and allowed to go to such county in the following cases:

(1) A person who shall have been convicted of a felony for the first time, and who shall have been under the age of twenty-five years at the time of such conviction, shall be eligible for parole after he shall have served one-fourth of the time for which he was sentenced, allowing time earned for good behavior;

(2) A person who shall have been convicted of a felony for the first time, and who shall have been over the age of twenty-five years at the time of such conviction, shall be eligible for parole after he shall have served one-third of the time for which he was sentenced, allowing time earned for good behavior;

(3) A person who shall have been convicted of a felony for a second time shall be eligible for parole after he has served one-half of the time for which he was sentenced, allowing time earned for good behavior;

(4) A person who shall have been convicted of a felony two or more times previously shall be eligible for parole after he shall have served three-fourths of the time for which he was sentenced, allowing time earned for good behavior;

(5) A convict on whom has been imposed an indeterminate sentence shall be eligible for parole after he has served the minimum of such sentence, allowing time earned for good behavior.

if one considers it would be a useless act if the prisoner serving a life sentence were not eligible for parole in the first place. This distinction between prisoners serving a term of years and a life sentence was carried forward into the 1939 code at SDC 13.4718 and the 1967 code at SDCL 24-5-1.[7] If persons serving life sentence were eligible for parole after 1913 until 1978, what legislative rationale would deny them recognition for good· behavior while granting it to the rest of the prison population serving a term of years?

[¶ 17.] The two Attorney General opinions of 1920 and 1925[8] relied upon by Brim which conclude parole was authorized for a life sentence, fail to rely on the above statutory analysis. Because there is no formula in the statutes after 1913 to determine parole eligibility for a life sentence, the Attorney General came up with the illogical conclusion that a person serving a fixed term of years (such as a burglar or bad check writer) could not be considered for parole until a given number of years has been served (one half of the sentence less good time) as set by a statutory formula; yet he concluded that a prisoner such as a multiple murderer, who is under a life sentence, the most severe penalty that could be imposed,[9] "may be paroled at any time after commitment to the State Penitentiary...." 1920 OpAtt'yGen 469, 470 and 1925 OpAtt'yGen 286. The opinions of the Attorney General are not binding on this Court. *Stumes v. Delano*, 508 N.W.2d 366, 372 (S.D.1993). We cannot accept the premise that our Legislature from 1913 until 1978 thought it appro-

priate to require minor felons to serve at least half their sentence (less good time) before parole could be considered, but would allow a person who shot and killed a pregnant mother of two to apply for parole the day he arrived at the penitentiary. We will not construe a statute to arrive at a " 'strained, unpractical or absurd result.' " *Island v. Dep't of Corrections*, 1996 SD 28, ¶ 8, 545 N.W.2d 201, 203 (quoting *Nelson v. South Dakota State Bd. of Dentistry*, 464 N.W.2d 621, 624 (S.D.1991)).

[¶ 18.] With no statutory good time for prisoners serving a life sentence and no statutory formula to set dates for parole on the books, if parole for prisoners serving life sentences did exist, this would create a situation of uncertainty and chaos. Yet, there is not a single reported case from 1913 until 1993 when it is raised in *Stumes* that any statutory interpretation is sought on this issue. The obvious conclusion is that there were no such cases because there was no parole to argue over or interpret.[10]

[¶ 19.] Also instructive is the case of *State v. King*, 82 S.D. 514, 149 N.W.2d 509 (1967). Therein we were faced with an equal protection challenge to the following statute:

'Every prisoner confined in the State penitentiary for a term of *less than life*, or held as a prisoner there under any means of lawful custody whether sentenced or not, who escapes or attempts to escape therefrom, is punishable by imprisonment in such Penitentiary for a term not exceeding five years. If such prisoner is confined therein under sentence of imprisonment, his sentence on conviction for such escape

---

7.  SDRC 5456 and SDC 13.4718 read in relevant part: "Every convict sentenced for any term less than life ... shall be entitled to a deduction from his sentence[.]"

8.  OpAtt'y Gen 470 (1920) and OpAtt'y Gen 287 (1925).

9.  South Dakota had no death penalty in effect from 1915 until 1939. See *State v. Moeller*, 1996 SD 60, ¶ 101, 548 N.W.2d 465, 487, and Opinion of the Judges, 83 S.D. 477, 479, 161 N.W.2d 706, 708 (1968).

10.  Our attention is called to SDCL 23–60–4 (formerly SDC 13.5304) which stated at the time of Brim's commitment that "[w]henever any person becomes an inmate of the Penitentiary it shall be

the duty of the Department to immediately establish in their record the date when such inmate will be eligible to parole." This statute was passed in 1955 as part of lengthy legislation which resulted in the creation of the Department of Probation and Parole. 1955 SD Sess.L. ch. 31 § 2. However, if this provision were meant to include those serving life sentences, it would run afoul of the fact that there is no statutorily authorized way to set such a date; as established above, there was no good time for lifers nor statutory formula to set the date for parole. Thus for prisoners serving a life sentence, the unpleasant reality of SDCL 23–60–4 was that they must serve their natural life in prison.

shall *commence at the expiration of the original term of his imprisonment.'* (Emphasis added.)

*Id.* (quoting SDC 1960 Supp. 13.1226). Two prisoners who were serving a term of years alleged they were denied equal protection of the law in that they must serve additional time for their escape after their original sentence, while the statute would, in effect, authorize no additional punishment for an escaped prisoner who was serving a life sentence. In rejecting this claim, we noted that a life sentence was just that, a life sentence, except when the Governor granted a pardon or commutation which was held to be "a privilege and not a right. . . ." *King,* 149 N.W.2d at 509–10. Noticeably absent is any suggestion that a life sentence could also be shortened by parole or that there was some statutory right by a person serving a life sentence to apply for a parole.

[¶ 20.] This statutory analysis advanced by the State is consistent with the factual record that exists in this case. Although much of the records have been lost with time, Arthur Canary, who was Executor Director of the South Dakota Parole Board after it took the parole function over from the Governor in 1961, stated that from the time of its creation, no person serving a life sentence was ever considered by the Board for parole. *See Stumes, supra.*[11] This policy is confirmed by Brim himself who stated in his brief before the Board of Pardons and Paroles, that his research indicated that it was during the period of 1913 to 1920 when the "Board of Charities and Corrections first formulated this practice." Brim also states that the Board uniformly enforced this policy up to January 1, 1979.[12]

[¶ 21.] SDCL 24–13–7 charges the Board of Pardons and Paroles with adopting procedural rules for "the effective enforcement of chapters 24–13 to 24–15" not the evasion of it. Rather than ignoring this area of the law, this Board, which is an expert in this area of the law, was correctly following it for the past 36 years.

[¶ 22.] In conclusion, it is clear that a person serving a life sentence in this state was eligible for parole only if sentenced prior to July 1, 1913. As Brim was not sentenced until 1958, he has no statutory right to request a parole date and his request for relief must be denied. "This court assumes that statutes mean what they say and that legislators have said what they meant." *Famous Brands,* 347 N.W.2d at 885.

[¶ 23.] As this issue is dispositive of the appeal, we need not reach Brim's second

---

**11.** In *Stumes* we noted the existence of the issue now before us but decided the case on other procedural grounds. Brim points to a statement in dictum where we said, "a parole date should have been set immediately." *Id.* at 373. However we also went on to observe:

> Stumes was sentenced to life in prison on March 27, 1974. No date was ever set as to when Stumes would be eligible for parole. The explanation for this is found in the affidavits presented to the parole board by Arthur Canary *former director of the Department of Probation and Paroles,* and Max Gors, former chairman of the South Dakota Board of Pardons and Paroles. According to them, persons serving life sentences in the South Dakota State Penitentiary at the time of Stumes' conviction and sentencing were not considered to be eligible for parole. These statements lend credence to the assertion that there was no parole available for a convict serving a life sentence even before the passage of SDCL 24–15–4 [in 1978].

*Id.* at 372.

Other passing references in our prior case law render little assistance in the resolution of the question now before us. *Bush v. Canary,* 286 N.W.2d 536 (S.D.1979) makes a passing reference that Bush, who was sentenced to life imprisonment, was subsequently paroled. At this time we have no background as to why this was done, under what circumstances, if it was an error of law on the part of the Board or the accuracy of the state of the record on this fact. What we do know is that in no way was it a disputed issue before the court in *Bush.* On the other hand, in *Cody v. Leapley,* 476 N.W.2d 257, 259 (S.D.1991) Cody was convicted of a murder committed in February, 1978 prior to the repeal of SDCL 23–60–15 and the adoption of our current statute SDCL 24–15–4. Yet the court "noted" in passing that "in South Dakota life in prison is without parole." *Id.* at n. 2. *See Stumes* 508 N.W.2d at 372–73.

**12.** Brim states "Each board adopted, enforced and published its rules, with one exception: the rule to justify the practice of requiring a convict serving a life sentence, before 1 January 1979, to secure a commutation to a number of years before being eligible for parole." Brief to Board at p. 6. In fairness to Brim he went on to argue that this "policy" was in contravention of the then-existing statutes.

issue as to whether there is a retrospective application of SDCL 24–15–4 (enacted in 1978 by 1978 SD Sess. L. ch. 186 § 21) which denies parole eligibility to inmates serving life sentences, and is claimed to be an ex post facto law when applied to Brim.

[¶ 24.] We affirm.

[¶ 25.] MILLER, C.J., and KONENKAMP, J., concur.

[¶ 26.] SABERS and AMUNDSON, JJ., dissent.

SABERS, Justice (dissenting).

[¶ 27.] I dissent. I can not agree with the majority's conclusion that there has been no parole eligibility for life prisoners since 1913. Accordingly, I would reach the issues of whether the 1978 statutory amendment violated ex post facto constitutional provisions and whether Brim waived his right to have a parole eligibility date set.

[¶ 28.] **1. STATE LAW REQUIRED THAT A PAROLEE ELIGIBILITY DATE BE SET FOR BRIM AT THE TIME OF HIS 1958 SENTENCE TO LIFE IMPRISONMENT.**

[¶ 29.] In 1978, the Legislature enacted SDCL 24–15–4, which provides: "A person sentenced to life imprisonment is not eligible for parole by the board of pardons and paroles." The statute became effective January 1, 1979. 1978 SD Laws, ch. 186, § 43. In its memorandum decision, the circuit court conceded that, prior to 1978, "the South Dakota Code reflected the ability of a defendant to a sentence of life to have the possibility of parole set." A person serving a life sentence prior to January 1, 1979 clearly was parole eligible. The provisions dictating that persons sentenced to life imprisonment could be afforded a pardon by complying with their *parole* provisions clearly evince a legislative intent to parole such persons. "This court assumes that statutes mean what they say and that legislators have said what they meant." *In re Famous Brands, Inc.,* 347 N.W.2d 882, 885 (S.D.1984) (citation omitted).

[¶ 30.] The same statements by former Board members which were offered in *Stumes* have been presented to us in this appeal. Just because the Board did not consider a person serving a life sentence as "being someone eligible for parole" did not make it so.[13]

> The purpose of rules regarding the construction of statutes is to discover the true intention of the law, and said intention is to be ascertained by the court primarily from the language expressed in the statute.
>
> In applying legislative enactments, we must accept them as written. The legislative intent is determined from what the legislature said, rather than from what we *or others* think it should have said.

*Famous Brands,* 347 N.W.2d at 884–85 (emphasis added) (citations omitted). The Board does not have the power to deviate from statutory procedures.[14] Provisions of parole acts relating to parole board procedures, including the time for eligibility to apply for

13. It is possible that it was not Brim's life sentence, but rather the detainer in his file which precluded consideration by the Board. A 1966 letter from his counsel to the circuit court stated: "[T]his detainer has the effect of depriving him of ever being eligible for parole." See *Cooper v. Lockhart,* 489 F.2d 308, 314 n. 10 (8th Cir.1973) (noting 10 generally recognized punitive consequences of a detainer, including: "the inmate is . . . inhibited by the denial of possibility of parole or any commutation of his sentence[.]").

14. It appears that perhaps the Board occasionally relied on commutations of life sentences to terms of years as a means to grant parole to those inmates sentenced to life imprisonment. In *Helm v. Solem,* the Eighth Circuit Court of Appeals took judicial notice of statistics on the frequency of commutations in South Dakota:

> The statistics indicate that 22 prisoners in the South Dakota penitentiary had their life sentences commuted between 1964 and 1975. The statistics, however, do not indicate what percentage of requests during this same time period were denied. Moreover, since 1975, the Governor of South Dakota has commuted no life sentences but has denied requests for commutation of life sentences from 25 prisoners[.]

684 F.2d 582, 585 n. 6 (8th Cir.), cert. granted, 459 U.S. 986, 103 S.Ct. 339, 74 L.Ed.2d 381 (1982). While gubernatorial commutation of sentences is a wholly constitutional practice, (SD Const. art. IV, § 3), it is not intended to replace statutory procedures according to which parole eligibility dates are set, hearings are held, and parole granted or denied.

parole, are viewed as creating mandatory duties on the board. *People ex rel. Abner v. Kinney*, 30 Ill.2d 201, 195 N.E.2d 651, 654 (1964) ("Neither the Parole Board nor the Department of Public Safety can by rules change the statutory provisions of eligibility for parole.").

[¶ 31.] When Brim entered prison, the Board was obligated to set a parole eligibility date: "Whenever *any* person becomes an inmate of the Penitentiary it *shall* be the duty of the Department to immediately establish in their record the date when such inmate will be eligible to parole." 1955 SD Laws, ch. 31, § 2 (codified today in essentially the same language at SDCL 24–15–3) (emphasis added). No exception for those sentenced to life imprisonment appeared in any provisions relating to parole eligibility dates until 1978.[15] When the law dictates that a parole date be set, an inmate is entitled to a "binding presumptive parole release date as mandated by clear legislative language." *Holston v. Florida Parole & Probation Comm'n*, 394 So.2d 1110, 1111 (Fla.Ct. App.1981) (citation omitted). *Cf. People v. Joyce*, 246 Ill. 124, 92 N.E. 607, 613 (1910):

[A sentence of imprisonment] is not all of the sentence. The provisions of the parole act are incorporated into the sentence by virtue of law, and become a part of it as much as if the provisions were actually written into it.

"The law does … mandate a 'date,' and, in the absence of evidence of an intent to use the term in an unusual sense, no express legislative definition should be required for an apparently unambiguous word." *Holston*, 394 So.2d at 1111 n1.

[¶ 32.] An inmate has no constitutional right to *parole*. *See Board of Pardons v. Allen*, 482 U.S. 369, 377 n. 8, 107 S.Ct. 2415, 2420 n. 8, 96 L.Ed.2d 303, 312 n. 8 (1987):

It is true that a State has no duty to establish a parole system or to provide for parole for all categories of convicted per-

sons … and that a State may place conditions on parole release; only in this sense is parole a privilege, not a right.

However, once the Legislature uses mandatory language, it may well create a constitutional right to a *parole date*. *See, e.g., Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (holding that even though the presence of a parole system, standing alone, did not give rise to a constitutionally protected liberty interest in parole release, the use of "shall" regarding criteria which must be met before parole will be granted creates a presumption that a parole release will be granted, and hence, a liberty interest in parole release protected by the Due Process Clause).

[¶ 33.] Similarly, our Legislature employed "shall" in describing the Board's duty to *immediately* set a parole eligibility date for *any person* becoming an inmate; use of such mandatory language creates a presumption that a parole date will be set upon incarceration. *Cf. Christopher v. United States Bd. of Parole*, 589 F.2d 924, 927 n8 (7th Cir.1978) ("Although an inmate being considered for parole does not have a *per se* right to be released on parole, *he does have a right to be considered for parole*.") (emphasis added); *People ex rel. Jones v. Russi*, 199 A.D.2d 1043, 608 N.Y.S.2d 914, 914–15 (1993) ("[Inmate] has the right to be considered for parole [but] does not have the right to be granted parole."); *see also People v. Toth*, 224 Cal.App.2d 130, 36 Cal.Rptr. 417, 418, *cert. denied*, 377 U.S. 983, 84 S.Ct. 1893, 12 L.Ed.2d 751 (1964):

Defendant shows great concern over the court's use of the term "rest of your natural life" in sentencing him. He seems to feel that this sentences him to life imprisonment without possibility of parole. He is mistaken. The sentence in no way restricts the normal possibility of parole.

---

**15.** The two attorney general opinions referenced in *Stumes*, and *supra* at ¶ 17 concurred that there was parole for life prisoners. The 1925 opinion expressly states "… that the *legislature* has not changed the statutes so as to make the holding in this opinion inapplicable." (Emphasis added). This should have put the Board on notice that 1) it must set a parole eligibility date for those inmates, and 2) it was up to the Legislature to direct it otherwise. For the Board to request and then ignore these opinions may be bad faith. In any event, the Board should not be credited for its misconstruction of the law simply because it "always did it that way."

[¶ 34.] When the Legislature enacted SDCL 24–15–4 in 1978, it set a policy which "totally rejects rehabilitation as a basic goal of our criminal justice system by imposing a life sentence without parole." *Helm,* 684 F.2d at 585. Perhaps the enactment of the 1978 statute reflected a nationwide shift in public policy regarding rehabilitation for certain offenders. However, it was for the Legislature to delineate that policy by statute, not for the Board to prematurely incorporate it into its policies and procedures. *See Isaac v. State Farm Mut. Auto. Ins. Co.,* 522 N.W.2d 752, 756 n. 1 (S.D.1994) (observing that the Legislature is the final arbiter of public policy); *see also Patterson v. State,* 660 So.2d 966, 969 (Miss.1995), *reh'g denied:*

> The [plea bargain] provision providing for life without parole was not a permissible option provided by the legislature ... thus, the court had no authority to issue such a sentence.

(Citing *Lanier v. State,* 635 So.2d 813 (Miss. 1994) (reaching an identical conclusion and holding that sentence of life imprisonment without possibility of parole was contrary to public policy because it was not authorized by statute)); *accord Stevenson v. State,* 674 So.2d 501 (Miss.1996) (noting also that the Mississippi statute was amended effective July 1, 1994 and only since then is a sentence of life imprisonment without parole lawful).

[¶ 35.] It is incredible that the majority calls the Board "an expert in this area of the law" when it (not once but *twice* ) requested opinions of the Attorney General on this very topic and then apparently ignored or rejected them. The majority correctly points out these opinions are not binding on this court, citing *Stumes v. Delano,* 508 N.W.2d 366, 372 (S.D.1993). What the majority apparently overlooks is the *Stumes* statement that for someone sentenced to life imprisonment pri-

or to January 1, 1979 *"a parole date should have been set immediately." Id.* at 373 (emphasis added).

[¶ 36.] Also curious is the majority's statement that "much of the records have been lost with time"—this has no support in the record.[16] The Board did not even advance this argument in its brief. Instead of producing records, the Board (and the majority) blindly rely on statements from Arthur Canary, former Executive Director of the Board, who contends that persons serving life sentences were *never* considered for parole. This is interesting, considering he is the named defendant in the case of *Bush v. Canary,* 286 N.W.2d 536 (S.D.1979), where Justice Morgan, writing a unanimous majority opinion discussing a parolee's appeal of revocation, began the opinion with the following recitation of the facts:

> Appellant Bush was convicted in South Dakota in 1960 of various felony offenses and *sentenced for life* to the state penitentiary. *He was released on parole* in April of 1974.

*Id.* at 538 (emphasis added). The "experts" may have been picking and choosing *which* inmates serving life sentences they wished to parole, but *Bush* unequivocally proves 1) they were paroling *some* of them and 2) Arthur Canary knew it.[17]

[¶ 37.] The Board argues the "impossibility" of calculating a parole date for a person serving life imprisonment. There are probably numerous methods by which this could be accomplished, and that argument is without merit. Parole eligibility dates are set for prisoners imprisoned to terms of years by simply establishing a requisite minimum based on a percentage of the sentence. *See* SDCL 24–15–5. It would not be "impossible" to do the same by consulting actuarial

**16.** As noted, the Eighth Circuit Court of Appeals relied on records provided by the penitentiary which covered, at a minimum, the years 1964 through 1982. *See Helm,* 684 F.2d at 585 n.6.

**17.** The majority dismisses the language in *Bush* as a possible "error of law on the part of the Board" or an inaccuracy in the record before the *Bush* court. Instead, it focuses on the case of *Cody v. Leapley,* 476 N.W.2d 257, 259 n2 (SD 1991). That footnote was written by then-Circuit

Court Judge Gilbertson, who is now Supreme Court Justice Gilbertson and the author of the majority opinion. He wrote: "In South Dakota life in prison is without parole" and cited SDCL 22–6–1. That statute is not authority for that proposition, but merely discusses felony classes and penalties without a mention of parole. Obviously, at the time *Cody* was written in 1991, there was no longer parole eligibility for inmates sentenced to life after 1978.

tables to calculate a prisoner's life expectancy from the time he began his sentence. Jerry Bush was paroled after spending fourteen years of a "life" sentence in the penitentiary—apparently there was some formula being used to determine a parole eligibility date. *Bush, supra.*

**[¶ 38.] 2. RETROSPECTIVE APPLICATION OF SDCL 24–15–4, ENACTED IN 1978 AND DENYING PAROLE ELIGIBILITY TO INMATES SERVING LIFE SENTENCES, VIOLATES EX POST FACTO CONSTITUTIONAL PROVISIONS.**

[¶ 39.] The statute denying parole eligibility to persons sentenced to life imprisonment was not enacted until twenty years after Brim began to serve his life sentence. Whether a statute should be accorded retroactive effect is well-settled:

> The general rule is that newly enacted statutes will not be given a retroactive effect unless such an intention is plainly expressed by the legislature. SDCL 2–14–21; *Schmaltz v. Nissen,* 431 N.W.2d 657 (S.D.1988); *Sheehan v. United Pacific Ins. Co.,* 439 N.W.2d 117 (S.D.1989).

*State v. Galligo,* 1996 SD 83, ¶ 6, 551 N.W.2d 303, 304 (noting an exception to this rule when the statute affects only procedural matters, as opposed to substantive rights). SDCL 24–15–4 has no language indicating the Legislature intended retroactive application, nor can a statute denying any possibility of parole to a whole class of persons be considered "procedural."

[¶ 40.] There are constitutional prohibitions against ex post facto laws. *See* U.S. Const. art. I, § 10; SD Const. art. VI, § 12.

> The *ex post facto* prohibition forbids the Congress and the States to enact any law which imposes a punishment for an act which was not punishable at the time it was committed, or imposes additional punishment to that then prescribed.... Our decisions prescribe that two critical elements must be present for a criminal or penal law to be *ex post facto;* it must be retrospective, that is it must apply to events occurring [before] its enactment,

and it must disadvantage the offender affected by it.

*Delano v. Petteys,* 520 N.W.2d 606, 608 (S.D. 1994) (citations and internal quotations omitted). Our analysis according to *Petteys* is twofold:

[¶ 41.] 1. First, is application of SDCL 24–15–4 to Brim "retrospective," i.e., does it apply to events occurring before its enactment? Obviously, this is easily answered in the affirmative. Brim was in prison for twenty years before the Legislature abrogated parole eligibility for persons serving life sentences.

[¶ 42.] 2. Next, does application of SDCL 24–15–4 to Brim disadvantage him as an "additional punishment to that then prescribed"? He was disadvantaged because he has not been allowed to take advantage of the right granted by the Legislature to be considered for parole and therefore, his term of confinement may have been increased. That denial of parole eligibility constitutes "punishment" is expressly stated in the United States Supreme Court opinion of *Warden v. Marrero:*

> [O]nly an unusual prisoner could be expected to think that he was not suffering a penalty when he was denied eligibility for parole. For the confined prisoner, parole—even with its legal constraints—is a long step toward regaining lost freedom....
>
> > "[W]hen [the legislature] expressly removes all hope of parole upon conviction and sentence for certain [offenses], this is in the nature of an additional penalty."

417 U.S. 653, 662–63, 94 S.Ct. 2532, 2538, 41 L.Ed.2d 383, 392, *reh'g denied,* 419 U.S. 1014, 95 S.Ct. 334, 42 L.Ed.2d 288 (1974) (citations omitted); *see also Helm,* 684 F.2d at 585 ("A life sentence without parole differs qualitatively from a sentence for a term of years or a life sentence with the prospect of parole."); *Rodriguez v. United States Parole Comm'n,* 594 F.2d 170, 176 (7th Cir.1979) ("Denial of any meaningful opportunity for parole by retroactive application of [rule] violates the ex post facto clause[.]"). Brim was eligible for parole prior to the enactment of SDCL 24–15–4. Therefore, retroactive application of that statute eliminates any opportunity he

had to shorten his time in prison and thus levies a punishment more serious than the life sentence imposed on him in 1958 *with the possibility of parole.*

[¶ 43.] The Board argues "not every statutory enactment constitutes a change in the law by reason of its enactment." It claims there was *never* a right for a person sentenced to life imprisonment to receive a parole eligibility date, and impliedly, that enactment of SDCL 24-15-4 was simply the codification of existing law. This court rejected a similar argument in *Petteys,* 520 N.W.2d 606. In that case, the State argued that a statutory amendment which authorized the discretionary revocation of an inmate's "good time" was not "an affirmative grant of power that did not exist prior [to the amendment], but rather [a] 'legislative rationalization of the discretion that already existed.'" *Id.* at 608. In disagreeing with that interpretation of legislative action, we stated:

> This interpretation conflicts with the presumption that the 1993 legislature did not intend a meaningless or ineffective result when adding the new language.... This court will not construe a statute in a way that renders parts to be duplicative and surplusage. This court is to presume that the legislature's [amendment] was passed to change existing law[.]

*Id.* at 609; *see also Sutherland Statutory Construction* § 22.30 (5th ed. 1993) ("[I]t is presumed that the provisions added by amendment were not included in the original act."); *accord John Morrell & Co. v. South Dakota Dep't of Labor,* 460 N.W.2d 141, 145 (S.D.1990); *State v. Heisinger,* 252 N.W.2d 899, 903 (S.D.1977). Key to the *Petteys* court's decision was the Legislature's use of the word "revise" in stating its purpose in amending the statute. Similarly, the enactment clause accompanying SDCL 24-15-4 states it is "An Act to *revise* the organization, powers, and duties of the board of pardons and paroles." *See* 1978 SD Laws, ch. 186, enactment cl. (emphasis added).

[¶ 44.] The majority argues that the reason for retaining § 2 of the 1911 act on the books, which allowed inmates sentenced to life imprisonment to be pardoned after 5 years compliance with parole provisions, was to deal with those paroled prior to July 1, 1913. This claim is made with no supporting authority. It is incredible the Legislature, if it thought it had done away with parole for life prisoners in 1913, would, 65 years later, finally feel compelled to say so. To make such a claim is to ignore a basic tenet of statutory construction, i.e., that provisions added by amendment are presumed to *change* existing law. We could just as easily "guess" that the reason the 30-year minimum sentence requirement was dropped was because the Legislature decided it was too long, too short, or that it was unfair to impose a blanket requirement which ignored individual characteristics.

### [¶ 45.] 3. BRIM DID NOT WAIVE HIS RIGHT TO HAVE A PAROLE ELIGIBILITY DATE SET.

[¶ 46.] The Board argues Brim waived his right to ask for, or to receive, a parole eligibility date by not requesting it before the old statutes were repealed.[18]

> A waiver must be made voluntarily, knowingly, and intelligently, with sufficient awareness of the relevant circumstances and likely consequences. The waiver of a constitutional right must be positively established, and the burden is on the party alleging waiver as courts closely scrutinize such allegations, indulging every reasonable presumption against waiver. When determining whether a constitutional right has been waived, this court looks to the totality of the circumstances.

*Smith v. Board of Pardons & Paroles,* 515 N.W.2d 219, 225 (S.D.1994) (quoting *State v. McCormick,* 385 N.W.2d 121, 123-24 (S.D. 1986)). In *McCormick,* circumstances weighing against a conclusion that a probationer waived certain rights included no showing that the court or counsel ever advised him his actions would constitute a waiver. 385

---

18. This contention by Board is at odds with its primary argument—that there was never any right to make such a request, and that any discussion regarding parole in the statutes amounted to merely "passing" or "parenthetical" reference.

N.W.2d at 124. Here, there has been no showing that the Board ever advised Brim that his failure to request a parole eligibility date would amount to a waiver of his right to have a date set. In fact, the Board argues there *never* was such a right; it follows that any request may have been futile.

[¶ 47.] There is no language in the statute delegating to incoming prisoners an affirmative role in requesting or receiving a parole eligibility date. On the contrary, when Brim was incarcerated, it was the duty of the Board to calculate and assign a parole date. *See* 1955 SD Laws, ch. 31, § 2, reproduced *supra* at ¶ 31.

[¶ 48.] Furthermore, Brim's request was prompted by language ·in *Stumes*, 508 N.W.2d 366. That opinion was handed down November 3, 1993. Brim filed his application for a parole eligibility date nine days later, on November 12, 1993. *Stumes* noted that there was a right to a parole eligibility date for persons under life imprisonment prior to the 1978 statute:

> The issue is whether or not the law changed the legal consequences of acts completed before the law's effective date [January 1, 1979]. Stumes was sentenced to life on March 27, 1974. *Under the statute, a parole date should have been set immediately.*

508 N.W.2d at 373 (emphasis added). There can be no showing of waiver by Brim when there is no showing he was aware of his right to receive a parole eligibility date prior to *Stumes*.

> The doctrine of waiver is applicable where one in possession of any right, whether conferred by law or by contract, and *with full knowledge of the material facts,* does or forebears the doing of something inconsistent with the exercise of the right. To support the defense of waiver, there must be a showing of a clear, unequivocal and decisive act or acts showing an intention to relinquish *the existing right.*

*Norwest Bank v. Venners,* 440 N.W.2d 774, 775 (S.D.1989) (citing *Subsurfco, Inc. v. B-Y Water Dist.,* 337 N.W.2d 448, 456 (S.D.1983)) (emphasis added).

[¶ 49.] We should reverse and remand and require that a parole eligibility date be set as required by law.

[¶ 50.] AMUNDSON, J., joins this dissent.